IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

In re:                                          )
                                                )
**FRANCHISE SERVICES OF NORTH**                 )        **CASE NO. 17-02316-EE**
**AMERICA INC.**                                )        **Chapter 11**
                                                )
        **Debtor**                              )
                                                )

## DECLARATION OF THOMAS P. MCDONNELL, III, IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS AND APPLICATIONS

I, Thomas P. McDonnell, III, do hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Thomas P. McDonnell, III. I am over the age of twenty-one, and I am competent to make this declaration. I am chairman of the board of directors and Chief Executive Officer of Franchise Services of North America Inc. (the "*Debtor*" or "*FSNA*" or the "*Company*"), which is a corporation organized and existing under the laws of Delaware, with its corporate headquarters and principal place of business located at 1052 Highland Colony Parkway, Suite 204, Ridgeland, Mississippi 39157. I own 22,557,478 shares of common stock of the Debtor, which is approximately 35.9% of the outstanding common stock of FSNA and is approximately own 17.5% of the fully diluted shares in FSNA.

2.      I am also the chairman of the board of directors and Chief Executive Officer of U-Save Holdings, Inc. ("*U-Save Holdings*") and U-Save Auto Rental of America, Inc. ("*U-Save Auto*"), which are corporations organized and existing under the laws of Mississippi, with their corporate headquarters and principal place of business located at 1052 Highland Colony Parkway, Suite 204, Ridgeland, Mississippi 39157. U-Save Holdings is a wholly owned subsidiary of FSNA, and U-Save Auto is a wholly owned subsidiary of U-Save Holdings.

-1-

3.     I am also the Chief Executive Officer of FSW LLC ("*FSW*"), formerly known as Simply Wheelz LLC d/b/a/ Advantage Rent-A-Car ("*Simply Wheelz*"), which is a Delaware limited liability company having its principal place of business at 1052 Highland Colony Parkway, Suite 204, Ridgeland, Mississippi 39157. FSW is a wholly owned affiliate of FSNA.

4.     I submit this declaration (the "*Declaration*") to assist the Court and other parties in interest in understanding the circumstances that necessitated the commencement of this Chapter 11 case (the "*Bankruptcy Case*") on June 26, 2017 (the "*Petition Date*"). This Declaration is in support of: (a) the Debtor's petition for relief under chapter 11 of the Bankruptcy Code and (b) the relief requested in the motions and applications filed by the Debtor on the Petition Date (collectively, the "*First Day Pleadings and Applications*" as defined in Paragraph 34 *infra*).

5.     After the Petition Date, the Debtor intends to continue to operate and manage its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The First Day Pleadings and Applications seek relief aimed at preserving the going concern value of the Debtor's estate and minimizing the adverse effects of the Chapter 11 filing on the Debtor's business by facilitating an orderly transition into, and uninterrupted operations throughout, the Chapter 11 process.

6.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with fellow members of the Debtor's senior management, and other of the Debtor's advisors, my review of relevant documents or business records, or my experience and knowledge of the Debtor's operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtor.

-2-

## BACKGROUND AND EVENTS LEADING TO THE CHAPTER 11 FILING

7.      In 2006, U-Save Holdings acquired FSNA , a public company under the Canadian Business Corporations Act, in a transaction (the "*2006 Transaction*") under Canadian law by which U-Save Holdings became a wholly owned affiliate of FSNA. At the time of the 2006 Transaction, FSNA was a publicly traded Canadian corporation. The shares of FSNA had been traded on the TSX Venture Exchange, a Canadian stock exchange headquartered in Calgary, Alberta, under the symbol "FSN," but at the present time, trading in those shares has been suspended.

8.      FSNA presently owns 100% of the membership interests of FSW, formerly known as Simply Wheelz, as well as 100% of the stock of U-Save Holdings. U-Save Holdings, in turn, owns 100% of the stock of U-Save Auto.

9.      In December 2011, Macquarie Capital (USA) Inc. ("*Macquarie*") approached FSNA, offering to provide services and funding to assist in FSNA's acquisition of the Advantage Assets[1] (described in footnote 1) from Hertz (the "*Hertz Transaction*"). Ultimately, FSNA agreed to team with Macquarie to purchase the Advantage Assets.

10.      The Macquarie executives that took charge of the Hertz Transaction were Michael Silverton ("*Silverton*") and Daniel Boland ("*Boland*"), both of whom were Managing Directors of Macquarie at that time.

11.      Macquarie and FSNA negotiated a transaction that involved, among other things, the purchase of a portion of the Advantage Assets by Adreca Holdings Corp. ("*Adreca*"), a subsidiary of Macquarie, with funding provided by Boketo LLC ("*Boketo*"), a wholly owned

---

[1] The opportunity for the Hertz Transaction arose because Hertz Global Holdings, Inc. ("*Hertz*") was seeking to acquire Dollar Thrifty Rent-A-Car ("*Dollar Thrifty*"). To resolve the objection of the Federal Trade Commission (the "*FTC*") that Hertz's \$2.3 billion acquisition of Dollar Thrifty would have been anticompetitive, Hertz agreed to sell its Advantage Rent A Car business ("*Advantage Business*"), as well as the right to operate 29 Dollar Thrifty on-airport locations around the country (collectively, the "*Advantage Assets*").

-3-

affiliate of Macquarie, to be followed by the merger of Adreca with and into FSNA. In consideration for funding the acquisition of the Advantage Assets, Macquarie, through Boketo, obtained preferred stock in FSNA upon completion of the acquisition and merger transactions, convertible to a 49.76% equity stake in FSNA. FSNA became the sole member of Simply Wheelz, which owned a substantial portion of the Advantage Assets. At that time, the former FSNA shareholders owned the remaining balance of the FSNA shares (approximately 50.24%) on a post-conversion basis.

12.     The majority of the Advantage Assets had been owned and operated by Simply Wheelz LLC, a Delaware limited liability company and a wholly owned Hertz subsidiary, prior to the FTC-forced divestiture. Under the Hertz Transaction, FSNA became the sole member of Simply Wheelz, which owned a substantial portion of the Advantage Assets. Other Advantage Assets, however, were titled in Adreca because the acquisition of the Advantage Assets occurred in multiple phases.

13.     On December 12, 2012, Adreca acquired a portion of the Advantage Assets business from Hertz, pursuant to the Amended and Restated Purchase Agreement, dated as of December 10, 2012, between Adreca and Hertz. Adreca oversaw all financial and corporate aspects of the Advantage Business and was involved in the decision-making on key operational and strategic issues because Adreca was a wholly owned subsidiary of Macquarie. Until the final FTC approval was obtained in May 2013, FSNA's role was to handle the day-to-day operations of the Advantage Business pursuant to a management agreement with Simply Wheelz, all under the oversight and direction of Adreca.

14.     On May 3, 2013, after the FTC approved the Hertz Transaction, Adreca was merged with and into FSNA, which previously had been a publicly traded Canadian corporation,

-4-

but which was re-domiciled as a Delaware corporation. FSNA was the surviving corporation of the merger. The Advantage Business was operated by Simply Wheelz, which had become a subsidiary of FSNA through the Hertz Transaction and FSNA's merger with Adreca.

15.    In connection with the Hertz Transaction, Macquarie charged FSNA a "Financial Advisory Fee" of $500,000.00, and an "Arrangement Fee" of $2,500,000.00. The Arrangement Fee was to be the consideration for Macquarie's funding and expertise that FSNA required to complete its acquisition from Hertz.[2]

16.    There were major inherent structural issues that Silverton and Boland, ostensibly for and on behalf of FSNA, negotiated with Hertz related to the Hertz Transaction that eventually and necessarily led to the filing of the 2013 Bankruptcy Case (as defined herein).[3]

17.    After the Hertz Transaction closed, Boketo appointed Silverton and Boland to the FSNA Board of Directors. Macquarie also appointed Bruce G. Donaldson ("***Donaldson***"), another Managing Director of Macquarie at the time, to the FSNA Board. Although Donaldson was involved in the Hertz Transaction for Macquarie, Boland and Silverton were the lead architects for the Hertz Transaction, while Donaldson's role was more operationally focused.

18.    There were significant structural issues (defects) with the Master Motor Vehicle Operating Sublease Agreement[4] with Hertz[5] that Boland and Silverton negotiated. Due to these

---

[2] Neither the "Financial Advisory Fee" of $500,000.00 nor the "Arrangement Fee" of $2,500,000.00 has been paid by FSNA. On December 30, 2016, Macquarie sued FSNA in the Supreme Court of New York County, New York [Case No. 650020/2017] for the Arrangement Fee, contending that Macquarie performed its obligations under the Merger Agreement in every particular . . . " FSNA disputes that contention, and has asserted counterclaims against Macquarie for breach of contract, breach of the partnership agreement and partnership duties, negligence, breach of warranty, and a request for an accounting in connection with Macquarie's actions with respect to the Hertz Transaction. That litigation is still pending. FSNA's counterclaim against Macquarie is anticipated to be one of the more significant assets in its bankruptcy estate.

[3] On December 15, 2016, FSNA filed suit against Boland and Silverton in the United States District Court for the Southern District of Mississippi, Civil Action No. 3:16-cv-964-HTW-LRA. That litigation is still pending.

[4] As a part of the Hertz Transaction, Hertz agreed to sublease approximately 22,495 vehicles to Simply Wheelz under a Master Motor Vehicle Operating Sublease Agreement, dated as of December 12, 2012, as amended,

-5-

issues, coupled with significant structural issues with the Hertz Line of Credit[6] that Boland and Silverton also negotiated, specifically a condition precedent[7] which neither Boland nor Silverton had disclosed to the FSNA Board of Directors, FSNA was not able to access the Hertz Line of Credit financing it needed to replace its vehicle rental fleet. Shortly thereafter, Macquarie refused to advance any monies to Simply Wheelz under the Macquarie Line of Credit.[8] Without funding from the Hertz Line of Credit or access to the Macquarie Line of Credit, and with the inherently defective structure of its Hertz Sublease Agreement with Hertz, Simply Wheelz was forced to file its Chapter 11 bankruptcy case on November 5, 2013, in the United States Bankruptcy Court for the Southern District of Mississippi, Case No. 13-03332-EE (the "*2013 Bankruptcy Case*") to protect its going concern value for all of its constituents.

19.    After the Hertz Transaction closed, Simply Wheelz conducted business under the brand name Advantage Rent-A-Car. At the time of the filing of the 2013 Bankruptcy Case,

---

between Hertz and Simply Wheelz (the "*Hertz Sublease Agreement*").    These 22,495 vehicles (the "*Hertz Vehicles*") comprised the majority of the rental car fleet of Simply Wheelz.

[5] The Hertz Sublease Agreement, which was amended by a Sublease Side Letter, provided that the "Capitalized Cost" for each Hertz Vehicle was the amount listed on a specified Vehicle Schedule. Under this methodology by which Hertz set its capitalized costs for the Hertz Vehicles, when Simply Wheelz returned the Hertz Vehicles, instead of receiving an anticipated gain on each Hertz Vehicle returned, Simply Wheelz was forced to pay Hertz for nearly every Hertz Vehicle returned to Hertz because of the inaccurate capitalized cost. (Subsequently, Hertz had to restate its earnings for years 2011, 2012, and 2013 to adjust for, among other things, its prior treatment of capitalization and depreciation.)

[6] To finance necessary replacement rental car fleet, Silverton and Boland negotiated a Hertz Senior Note Credit Agreement, dated as of December 12, 2012, by and between The Hertz Corporation and Simply Wheelz LLC d/b/a Advantage Rent A Car, in the amount of $45,000,000.00 (the "*Hertz Line of Credit*"), with the use of the loan proceeds being limited solely to purchase or refinance vehicles for use in Simply Wheelz's domestic daily rental car business.

[7] The condition precedent was that Simply Wheelz had to return approximately $125 million of Hertz Vehicles to Hertz before it could draw on the Hertz Line of Credit (the "*Condition Precedent*").

[8] Similarly, Silverton and Boland negotiated a Subordinated Credit Agreement with Boketo, LLC, a wholly owned subsidiary of Macquarie, for Simply Wheelz for a $7.5 million line of credit (the "*Macquarie Line of Credit*"), under which advances would bear interest at the rate of 25% per annum, to be paid either in cash or in kind with common shares of FSNA, at the Lender's option. The advances were to be used to meet the obligations of Simply Wheelz in the ordinary course of business or for any other commercially reasonable purpose.

Simply Wheelz maintained a fleet of approximately 23,000 vehicles in 73 locations throughout the United States and was the fourth largest retail rental car provider in North America, employing approximately 1,800 employees and outside contractors.

20.    Early in the 2013 Bankruptcy Case, Simply Wheelz reached a Court-approved settlement agreement with Hertz by which Simply Wheelz continued to use the Hertz-leased vehicles for an additional period of time, but eventually returned all of the Hertz-leased vehicles to Hertz. Simply Wheelz then had to secure additional vehicles, and did so with the assistance of its DIP Lender and Stalking Horse Buyer, Catalyst Capital Group, Inc. ("*Catalyst*"). In fact, Simply Wheelz secured access to vehicle financing in excess of $300 million during the 2013 Bankruptcy Case.

21.    During the 2013 Bankruptcy Case, Simply Wheelz sold substantially all of its assets (the "*Simply Wheelz Assets*") to Advantage Opco, LLC ("*Advantage Opco*"), a subsidiary of Catalyst. Additionally, some of the assets of FSNA, which were integral to the Advantage Rent-A-Car operation (the "*FSNA Assets*"), were also sold as a part of that sale transaction (collectively, the "*Catalyst Sale Transaction*"). The Simply Wheelz Assets and the FSNA Assets purchased by Advantage Opco from Simply Wheelz and FSNA in the Catalyst Sale Transaction, which included assets related to more than 40 locations previously operated by Simply Wheelz, are collectively referred to as the "*Purchased Assets*."

22.    The Purchase Price for the Purchased Assets, as set forth in the Asset Purchase Agreement [Dkt. # 265, Case No. 13-03332-EE, Article III, ¶ 3.1(a)], was comprised of the amount of the Credit Bid plus the amount of the Assumed Liabilities. The amount of the Credit Bid was not to exceed $46 million. Included in the Assumed Liabilities, however, were three

Master Lease Agreements which provided fleet financing facilities in the amount of $100 million each, or a total of $300 million of credit facilities.

23.    Because Catalyst notified Simply Wheelz that certain locations would be excluded from the Purchased Assets for which it had the right to acquire (the "***Non-Transferred Locations***"), Simply Wheelz conducted secondary and tertiary sales processes for the Non-Transferred Locations that Catalyst did not acquire. By this process, Simply Wheelz was able to sell to Hertz, Avis Budget Group, Inc., and Sixt Rent-a-Car LLC previously unsold assets associated with 23 different locations. Simply Wheelz, with the Court's approval, rejected the leases and contracts associated with the few remaining Non-Transferred Locations.

24.    Because the Court had authorized the payment of critical vendor payments at the outset of the 2013 Bankruptcy Case for approximately 60 critical vendors, which payments were funded by the Debtor's DIP Lender, substantially all of the unsecured pre-petition obligations of Simply Wheelz were satisfied during the 2013 Bankruptcy Case. Additionally, because nearly all of the locations at which Simply Wheelz had operated were sold during the 2013 Bankruptcy Case, substantially all of the liabilities associated with those purchased locations were assumed by the respective purchaser for each location. Some liabilities of Simply Wheelz, however, were not paid during the 2013 Bankruptcy Case.

25.    Following the sale of substantially all of the assets of Simply Wheelz, and the settlement of the adversary proceeding in the 2013 Bankruptcy Case styled "*Simply Wheelz LLC v. Merchants Automotive Group, Inc.*," Adv. Pro. No. 15-00059-EE, in which the Debtor sought, among other things, a determination of the rights of Simply Wheelz and Merchants under the Master Agreement, the Bankruptcy Court entered its *Agreed Order Granting Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a), 305(a)(1), and 1112 and Fed. R. Bankr. P. 9019 for*

-8-

*Entry of an Order: (I) Approving Settlement and Releasing Claims; (II) Dismissing the Bankruptcy Case upon Implementation of Settlement; and (III) Granting Related Relief* [Dkt. # 923]. On February 28, 2017, the Bankruptcy Court entered its *Final Decree/Order Closing Case* [Dkt. # 950] thereby closing the 2013 Bankruptcy Case.

26.     U-Save Holdings was FSNA's legacy business before its acquisition of the Advantage Assets. U-Save Holdings owns 100% of the stock of U-Save Auto Rental, which in turn owns 100% of the stock of Auto Rental Resource Center, Inc., U-Save Car Sales, Inc., Practical Rent-A-Car System, Inc., Hollywood Call Center, Inc., U-Save Leasing, Inc., and Peakstone Financial Services, Inc. FSNA and its subsidiaries own the following brands: U-Save Car & Truck Rental, U-Save Car Sales, Auto Rental Resource Center, Xpress Rent A Car, Sonoran National Insurance Group, and Peakstone Financial Services.

27.     U-Save and its subsidiaries grant franchises for the operation of vehicle rental stores under the following brands: U-Save Car & Truck Rental and U-Save Car Sales. These franchisees, along with independent car rental associates under the ARRC model, operate more than 650 locations throughout the United States, which makes U-Save one of North America's largest franchise car rental companies. U-Save currently services 25 airport markets in 10 different states and 15 countries. U-Save Car Sales is an expansion of the U-Save brand into the car sales market, and provides goods and services to car sales operators looking to affiliate with a national brand.

28.     U-Save Auto Rental and its subsidiaries continue to operate, even though those operations were hampered by the 2013 Bankruptcy Case.

29.     The four primary assets of FSNA are: (a) its equity interest in U-Save Holdings, Inc.; (b) its claims against Macquarie; (c) its claims against Silverton and Boland; and (d) its equity interest in FSW.

30.     The Debtor is prepared to administer this Bankruptcy Case for the benefit of all constituencies, and believes that Chapter 11 provides a context in which the Debtor can maximize the value of its assets for the benefit of all constituents.

31.     To that end, the Debtor intends initially to pursue a necessary competitive, robust and transparent sales process for the sale of its stock in U-Save Holdings, as well as to pursue the claims described above.

32.     Trace Residential Properties LLC ("*Trace*"), an entity in which I am the managing member, is willing to be the DIP Lender to fund the administrative expenses associated with this Bankruptcy Case, according to the terms set forth in the DIP Term Sheet. Because Trace is willing to be the DIP Lender, and because Trace is also willing to submit a proposal to purchase the stock of U-Save Holdings through the Court-supervised sale process to be administered by a third party broker, it is appropriate for me not to be involved in the day-to-day management of the Debtor or the administration of the Bankruptcy Case. Accordingly, I will step aside as President of the Debtor and Chairman of the Board during the Bankruptcy Case, and Bruce Donaldson, one of the Debtor's directors, will step into my shoes as the Interim Executive Chairman.

33.     Further, it is advisable to have an experienced, disinterested third party be primarily responsible for the administration of the Bankruptcy Case. To that end, the Debtor has authorized the retention of Meadowlark Advisors LLC, with Jonathan Nash ("*Nash*") designated to serve as the Chief Restructuring Officer ("*CRO*"), for the Bankruptcy Case.

## FIRST DAY PLEADINGS AND APPLICATIONS

34.     I have read and reviewed the following First Day Pleadings and Applications (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief:

(a)     *Motion of the Debtor for Expedited Hearings on First Day Pleadings and Applications*;

(b)     *Motion of the Debtor for Authority to Maintain Existing Bank Account*;

(c)     *Motion of the Debtor for Authority to Pay Post-Petition Installments on Insurance Policies Necessary to Maintain Insurance Coverage*;

(d)     *Motion of the Debtor for a Preliminary and Final Order (A) Authorizing Post-Petition Financing on a Secured and Super Priority Basis Pursuant to 11 U.S.C. §§ 105, 364(c)(1), 364(c)(2), 364(c)(3), and 507(b); (B) Granting Other Related Relief; and (C) Scheduling a Final Hearing Pursuant to Rule 4001(c)(2)*;

(e)     *Motion of the Debtor for Order Directing the Examination of Bruce G. Donaldson Pursuant to Federal Rule of Bankruptcy Procedure 2004*; and

(f)     *Application of the Debtor Pursuant to 11 U.S.C. §§ 105(A), 327, and 363(B) to (I) Retain Meadowlark Advisors LLC to Provide the Debtor with a Chief Restructuring Officer, and (II) Designate Jonathan J. Nash as Chief Restructuring Officer for the Debtor Nunc Pro Tunc to June 26, 2017.*

(collectively, the "***First Day Pleadings and Applications***").

35.     **Expedited Hearings on Certain First Day Pleadings and Applications**. The relief requested in each of the First Day Pleadings and Applications is necessary to avoid immediate and irreparable harm to the Debtor's businesses and to the bankruptcy estates. It is

-11-

also essential that the Debtor continues to maintain its ongoing business operations with minimum disruption and that the Debtor be able to preserve the assets of the bankruptcy estate. Therefore, I believe this Court should address the First Day Pleadings and Applications on an expedited basis and as soon as practicable so that adverse consequences may be avoided and so the Debtor's Chapter 11 case can proceed without delay.

36. **Authority to Maintain Existing Bank Account**. Prior to the Petition Date, the Debtor maintained a certain bank account with Regions Bank. The Office of the United States Trustee's debtor-in-possession guidelines would require the Debtor to, among other things: (a) close the existing bank account and to open new debtor-in-possession account at an approved depository bank; and, (b) obtain checks for such debtor-in-possession account which bear the designation "debtor-in-possession," the Bankruptcy Case number, and the type of account. I believe that maintaining the pre-petition account is in the best interest of the Debtor, the bankruptcy estate and creditors. It would be extremely difficult, disruptive, and expensive for the Debtor to close its account and open a new account. The Debtor has and will continue to take certain actions and institute procedures that will prevent the payment of pre-petition obligations that are not otherwise approved by the Court. The Debtor has also contacted the United States Trustee prior to filing for protection under the Bankruptcy Code and explained the related matters. The United States Trustee has generally approved the form Order that the Debtor intends to present to the Court. Considering the potential harm the Debtor would suffer should it be forced to comply with the United States Trustee guidelines, I believe it is critical that the Debtor have the authority to maintain its existing bank account. In addition, I believe the Debtor has taken adequate precautions to avoid paying any pre-petition obligations that are not otherwise approved by the Court.

37.     **Authority to Pay Post-Petition Installments on Insurance Policies Necessary to Maintain Insurance Coverage**.  The Debtor maintains various types of insurance in the ordinary course of its business.  The types of insurance policies held by the Debtor (each, a "*Policy*" and collectively, the "*Policies*"), include, but are not limited to, coverage for directors and officers and employment practices liability.  The Debtor needs these essential Policies to preserve the bankruptcy estate and its business.  I believe it is essential for the Debtor to be given the authority to pay the post-petition payments on the Policies in the ordinary course of business to maintain insurance coverage that is currently in effect or to secure new, replacement insurance coverage.  I believe and upon advice that due to the importance of maintaining continued insurance coverage with respect to all of their business activities and preservation of the Debtor's assets and the bankruptcy estate, the authority to continue in effect the policies is in the best interest of the bankruptcy estate and all interested parties; and further, is absolutely essential to the Debtor's ability to maximize the value of the bankruptcy estate and in order to continue to address their continuing obligations.

38.     **Post-Petition Financing on a Secured and Super-Priority Basis Pursuant to 11 U.S.C. §§ 105, 364(c)(1), 364(c)(2), 364(c)(3), and 507(b)**.  The Debtor needs additional, post-petition financing.  The Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The DIP Facility represents the Debtor's only opportunity under the circumstances to obtain emergency post-petition financing necessary to fund the Debtor's operations in Chapter 11, to continue to address its obligations, and to ensure that the Debtor's value as a going concern is preserved.  I believe the DIP Facility results from the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitutes a transaction for reasonably equivalent and fair consideration.

39.     The proposed DIP Facility is required to allow the Company to operate in the ordinary course of business, to maintain the orderly continuation of the operation of its business; to maintain business relationships, and to satisfy other operational needs; and, most importantly, to facilitate the sale of stock owned by the Debtor in one or more of its subsidiaries as a going concern. I have reviewed the proposed Approved Budget, and I believe that it is both reasonable and realistic in the assumptions used and in the Approved Budget itself. A copy of the Approved Budget is attached to this Declaration as **Exhibit A**.

40.     I believe financing is not available from other sources on equally favorable terms. The DIP Facility is the most efficient, least expensive mechanism available to meet the Debtor's immediate short-term needs. I believe the DIP Facility provides the Debtor with the best available opportunity to maximize liquidity and working capital. I also believe that finding new financing from other sources, even if possible, would likely be markedly more expensive and potentially disruptive to the Debtor's estate and business, and at this point in time, threaten the viability of the Debtor's ability to maximize the value of the bankruptcy estate.

41.     The Debtor has an immediate need for financing pursuant to the DIP Facility and the DIP Loan Documents. The DIP Facility will allow the Debtor to continue to pay the costs of the administration of the Bankruptcy Case without interruption, as well as maintaining the orderly continuation of the operation of the businesses of its subsidiaries and assisting them in maintaining business relationships. Most importantly, this funding will facilitate the sale of stock owned by the Debtor in one or more of its subsidiaries as a going concern. I believe that without immediate authority to obtain financing on the terms and conditions set forth in the DIP Loan Agreement, the Debtor will be unable to meet its costs and expenses of the bankruptcy

-14-

administration, which, in turn, would cause immediate and irreparable harm to the bankruptcy estate.

42.     Further, I believe that in order to preserve the value of the Debtor's assets and the Debtor's ability to manage the bankruptcy estate for the benefit of creditors and other parties in interest, the Debtor should be granted the authorization to obtain financing under the DIP Facility on an interim basis as necessary to avoid immediate and irreparable harm to the bankruptcy estate pending a final appeal on that particular Motion.

43.     The Debtor, in connection with and in addition to the DIP Facility, should be permitted on an interim basis in accordance with the specific terms and conditions contained in the DIP Loan Documents, to use its cash.  Because the Debtor does not have a pre-petition senior lender with a lien on its cash or property that otherwise would constitute Cash Collateral, the Debtor seeks only the right to use the Cash Collateral of the DIP Lender consistent with and subject to DIP Term Sheet and the Approved Budget.

44.     I believe the Debtor has an immediate need to access the DIP Facility for the purpose of meeting necessary expenses incurred in the ordinary course of its business, as well as addressing the Debtor's administrative costs associated with this Bankruptcy Case.  Further, I believe the inability of the Debtor to access the DIP Facility could likely result in an immediate cessation of the ongoing operations of the Debtor's business, the cessation of ongoing efforts by the Debtor to address bankruptcy issues, and would most certainly cause irreparable harm to the Debtor, the bankruptcy estate, and creditors and other parties-in-interest.

45.     The Debtor's use of the DIP Facility proceeds on the terms contained in the Interim Order is the only source of funding of the Debtor's ongoing operations and to pay the administrative expenses associated with this Bankruptcy Case.  It is in the best interests of the

-15-

Debtor, all of its creditors and the bankruptcy estate to permit the Debtor to avail itself of the DIP Facility, all of which imposes no prejudice or harm on any party in interest.

46.     **Rule 2004 Examination of Bruce G. Donaldson.**  In connection with the *Motion of the Debtor for Order Directing the Examination of Bruce G. Donaldson Pursuant to Federal Rule of Bankruptcy Procedure 2004*, as stated above, the four primary assets of FSNA are: (a) its equity interest in U-Save Holdings, Inc.; (b) its claims against Macquarie; (c) its claims against Silverton and Boland; and (d) its equity interest in FSW.

47.     The Debtor wishes to obtain testimony from one of its current Directors, Bruce G. Donaldson, concerning the value of these assets, particularly additional details concerning FSNA's claims against Macquarie and against Boland and Silverton.

48.     The Debtor seeks to obtain information under oath from Donaldson with respect to information regarding and details of the acts and conduct of certain of the directors of the Debtor with respect to the Hertz Transaction, and also with respect to property, claims, and liabilities of the Debtor, and also to matters which may affect the administration of the bankruptcy estate, all as contemplated by Rule 2004(b).

49.     Donaldson is not a party to any litigation related to any matter to be covered in the examination.  This Rule 2004 examination is not designed to abuse or harass.  Rather, Donaldson has agreed, pursuant to an Order granting the Rule 2004 Motion, to being examined under oath at the offices of the Debtor's counsel in Mississippi on July 13, 2017.

50.     An examination to obtain such information and documentation is appropriate because it may reveal the nature and extent of property of the bankruptcy estate and may assist the Debtor in discovering assets, examining transactions, and determining whether any

-16-

wrongdoing has occurred. Additionally, this information would facilitate the administration of the Bankruptcy Case.

51. **Retention of Meadowlark Advisors LLC as Chief Restructuring Officer**. To avoid both any actual conflict, as well as any appearance of impropriety, and to obtain an experienced, disinterested bankruptcy professional to guide the Debtor through its Bankruptcy Case, the Board of Directors authorized the retention of a Chief Restructuring Officer to be primarily responsible for the administration of the Bankruptcy Case. The Debtor has authorized the retention of Meadowlark Advisors LLC, with Jonathan Nash designated to serve as the CRO for the Bankruptcy Case. Meadowlark and Nash served as the CRO in the Chapter 11 cases of *In re Mississippi Phosphates Corporation, et al.*, Case No. 14-51667-KMS, which were confirmed last year. Nash was a Principal in the Corporate Restructuring Group of Deloitte Transactions and Business Analytics LLP before leaving it to form Meadowlark, a strategic and financial advisory firm located in Austin, Texas.

## CONCLUSION

52. In conclusion, for the reasons stated herein and in each of the First Day Pleadings and Applications filed concurrently or in connection with the commencement of this Bankruptcy Case, I respectfully request that each of the First Day Pleadings and Applications be granted in its entirety, together with such other and further relief as this Court deems just and proper.

53. I certify under penalty of perjury that based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank]*

-17-

THIS the 26th day of June 2017.

THOMAS P. MCDONNELL, III

## Exhibit A

*Franchise Services of North America Inc. Approved 13-Week Budget*

# Franchise Services of North America, Inc.

## Cash Flow Projection

As of week ending: 6/23/2017

| US$ in thousands | Ending: | Week 1 6/30/2017 | Week 2 7/7/2017 | Week 3 7/14/2017 | Week 4 7/21/2017 | Week 5 7/28/2017 | Week 6 8/4/2017 | Week 7 8/11/2017 | Week 8 8/18/2017 | Week 9 8/25/2017 | Week 10 9/1/2017 | Week 11 9/8/2017 | Week 12 9/15/2017 | Week 13 9/22/2017 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance (Book)** | | 0.2 | 92.0 | 91.0 | 91.0 | 91.0 | 90.0 | 81.0 | 81.0 | 81.0 | 81.0 | 25.0 | 25.0 | 25.0 | |
| ***Operating Cash Flow:*** | | | | | | | | | | | | | | | |
| Receipts from Subsidiaries | | | | | | | | | | | | | | | |
| U-Save of America, Inc. | | 12.0 | - | - | - | 77.0 | - | - | - | 79.7 | 12.0 | - | - | - | 180.7 |
| Other | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | | | | | | | | | | | | | | |
| Receipts from 363 Sale | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | | 12.0 | - | - | - | 77.0 | - | - | - | 79.7 | 12.0 | - | - | - | 180.7 |
| TSD Reservations Fees | | 12.0 | - | - | - | 12.0 | - | - | - | - | 12.0 | - | - | - | 36.0 |
| Expedia | | - | - | - | - | 65.0 | - | - | - | 70.0 | - | - | - | - | 135.0 |
| TrustPilot | | - | - | - | - | - | - | - | - | 9.7 | - | - | - | - | 9.7 |
| Audit and Accounting | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer Agent | | - | 1.0 | - | - | - | 1.0 | - | - | - | - | 1.0 | - | - | 3.0 |
| Exchange and Commissions | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Corporate Communication | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Board Meetings and Expenses | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | | 7.9 | - | - | - | - | 7.9 | - | - | - | 7.9 | - | - | - | 23.6 |
| **Total Operating Disbursements** | | 19.9 | 1.0 | - | - | 77.0 | 8.9 | - | - | 79.7 | 19.9 | 1.0 | - | - | 207.4 |
| **Net Operating Cash Flow** | | (7.9) | (1.0) | - | - | - | (8.9) | - | - | - | (7.9) | (1.0) | - | - | (26.7) |
| ***Bankruptcy & Restructuring Costs:*** | | | | | | | | | | | | | | | |
| Deposits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Professionals | | - | - | - | - | - | - | - | - | - | 247.5 | - | - | - | 247.5 |
| Debtor's Broker | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| UCC Professionals | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest & Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| United States Trustee Fees | | - | - | - | - | 0.7 | - | - | - | - | - | - | - | - | 0.7 |
| Other / Contingency | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Bankruptcy & Restructuring Costs** | | - | - | - | - | 0.7 | - | - | - | - | 247.5 | - | - | - | 248.2 |
| Net Cash Flow Before DIP | | (7.9) | (1.0) | - | - | (0.7) | (8.9) | - | - | - | (255.4) | (1.0) | - | - | (274.8) |
| Minimum Cash Balance | | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 |
| **DIP Borrowing / (Repayment)** | | 100.0 | - | - | - | - | - | - | - | - | 199.4 | 1.0 | - | - | 300.4 |
| Net Cash Inflow / (Outflow) | | 92.1 | (1.0) | - | - | (0.7) | (8.9) | - | - | - | (56.0) | - | - | - | 25.6 |
| Ending Cash Balance (Book) | | 92.0 | 91.0 | 91.0 | 91.0 | 90.0 | 81.0 | 81.0 | 81.0 | 81.0 | 25.0 | 25.0 | 25.0 | 25.0 | |

## Summary Liquidity Forecast

| DIP Facility | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ - | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 299 | $ 300 | $ 300 | $ - |
| Net Borrowing / (Repayment) | 100 | - | - | - | - | - | - | - | - | 199 | 1 | - | - | 300 |
| Ending Balance | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 299 | 300 | 300 | 300 | 300 |
| Less: Accrued PIK Interest and Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Commitment | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Total Availability | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 201 | 200 | 200 | 200 | 200 |
| **Total Liquidity (Book Cash + DIP Availability)** | $ 492 | $ 491 | $ 491 | $ 491 | $ 490 | $ 481 | $ 481 | $ 481 | $ 481 | $ 226 | $ 225 | $ 225 | $ 225 | $ 225 |