*EXECUTION COPY*

# DIP LOAN TERM SHEET

## Summary of Key Terms and Conditions for
## First Priority Senior Secured $250,000 DIP Multi-Draw Term Loan Facility

This term sheet ("***Term Sheet***") shall not become binding unless and until (1) the Term Sheet is signed by the DIP Lender and the Debtor, and (2) the Interim Order approving the DIP Facility contemplated by this Term Sheet has been approved. Prior to satisfaction of the two conditions set forth in the immediately preceding sentence, this Term Sheet shall be non-binding, for discussion purposes only, and shall not be construed as a commitment of any kind to provide the DIP Facility.

This Term Sheet sets forth certain of the key terms and conditions by which TRACE RESIDENTIAL PROPERTIES LLC or its designee (the "***DIP Lender***"), is willing to provide FRANCHISE SERVICES OF NORTH AMERICA, INC. (the "***Company***" or the "***Debtor***") with a commitment (the "***Commitment***") for a first priority senior secured DIP multi-draw term loan facility (the "***DIP Facility***") in an amount of $250,000.00 (which may be increased up to an incremental $250,000.00 to a total of up to $500,000.00 in the sole discretion of the DIP Lender) in the event the Company commences a voluntary chapter 11 case (the date of commencement, the "***Petition Date***"). The purpose of the DIP Facility is to provide sufficient liquidity for the Debtor in the administration of the Bankruptcy Case, particularly to enable the Debtor to facilitate a sale of certain of the Debtor's assets pursuant to section 363 of the Bankruptcy Code.

Unless otherwise stated herein, each material term set forth herein shall be included in an interim order in form and substance satisfactory to the DIP Lender in its sole discretion (the "***Interim Order***") and final order in form and substance satisfactory to the DIP Lender in its sole discretion (the "***Final Order***;" together with the Interim Order, the "***DIP Order***"), each authorizing the extension of the DIP Facility contemplated hereby.

| | |
|---|---|
| **DIP Loans** | Subject to closing conditions and reasonable documentation to be agreed, including, without limitation, the Interim Order and the Final Order (the "***DIP Documentation***"), the DIP Lender shall be the sole lender in connection with the DIP Facility. The proceeds of the loans made under the DIP Facility (the "***DIP Loans***") shall be used by the Company in connection with the administration of the Bankruptcy Case, including the sale of the Debtor's assets, all pursuant to the Budget. |
| | The DIP Loans will be made in multiple draws, with the first draw in the amount of $100,000 and occurring on the day the Interim Order is entered (or on such later date as mutually agreed among the Debtor and the DIP Lender) and the Debtor may make subsequent draws from time to time in amounts of at least $25,000.00, subject to (x) receipt of one business days' prior written notice of a borrowing request, (y) compliance with the Budget as described below and (z) the absence of any Event of Default or any event, circumstance or condition, that with the passage of time, would become an Event of Default; <u>provided</u>, |

- 1 -

| | |
|---|---|
| | however, prior to the entry of a Final Order, the Debtor shall not be permitted to borrow more than $100,000.00 under the DIP Facility. Upon being drawn down, proceeds of the DIP Loans, which shall constitute the DIP Lender's cash collateral, will be deposited into a bank account of the Debtor acceptable to the DIP Lender (each, a "***DIP Account***"). So long as no Default or Event of Default (each as defined below) shall have occurred and be continuing, amounts in the DIP Accounts may be used by the Debtor for the administration of the Bankruptcy Case pursuant to the Budget. <br><br> Any amounts remaining in the DIP Account at the maturity of the DIP Facility (whether by acceleration or otherwise) shall be applied to reduce the DIP Obligations (as defined below) then outstanding. <br><br> As used herein, the term "***DIP Obligations***" shall mean all principal, interest, fees, costs, expenses, charges and other amounts owing to the DIP Lender in respect to the DIP Facility. |
| **Interest Rate** | Interest on the DIP Obligations shall be payable monthly in arrears in cash. The outstanding principal amount of all DIP Obligations shall bear interest at the rate of six percent (6%) per annum. <br><br> After the occurrence and during the continuance of an Event of Default (as defined below), all outstanding DIP Obligations shall bear an additional 2.00% per annum of interest, which additional interest will be payable on demand. <br><br> Interest on the DIP Facility shall be paid in cash, monthly in arrears. <br><br> Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days. |
| **Fees** | DIP Lender will charge the Debtor a Closing Fee equal to 0.0% of the total commitments under DIP Facility (including, without limitation, commitments subject to entry of a Final Order) and payable in cash on the closing date from the proceeds of the DIP Facility. <br><br> DIP Lender will charge the Debtor an Undrawn Commitment Fee equal to 0.0% per annum times the daily average undrawn portion of the DIP Facility and payable in arrears in cash on the first business day of each calendar month. <br><br> DIP Lender will charge the Debtor a Funding Fee equal to 0.0% of the principal amount of each borrowing under the DIP Facility and payable in cash on the date on which such borrowing is made. <br><br> All fees will be non-refundable and calculated using a 360-day year |

|  | and actual days elapsed. |
|---|---|
| **Mandatory Prepayments** | The following mandatory prepayments of the DIP Facility are required:<br><br>Asset Sales: Immediately following the Debtor's receipt by the Debtor, a prepayment in an amount equal to 100% of the proceeds (net of reasonable transaction-related expenses determined acceptable by the DIP Lender) of the sale or other disposition of any property or assets of the Debtor outside the ordinary course of business. |
| **Expense Reimbursement** | All pre-petition and post-petition fees and expenses of the DIP Lender (including, without limitation, the fees and expenses of any legal counsel retained by the DIP Lender) incurred in connection with the DIP Loan, including (i) the diligencing, negotiation, documentation, consummation, administration or any other aspect of the DIP Facility and the DIP Documentation, or (ii) incurred in connection with the enforcement of rights and remedies under the DIP Facility, are to be reimbursed on a current basis by the Debtor from the proceeds of DIP Loans and shall constitute part of the DIP Obligations. For avoidance of doubt, all such fees and expenses described in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Budget with respect thereto and shall constitute DIP Obligations. |
| **Credit Bid** | The DIP Lender may, at its discretion, credit bid all or any portion of the DIP Obligations, in addition to any other amounts owing to the DIP Lenders, as part of any bid submitted in a sale of the Debtor's assets either pursuant to §363(k) of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code. |
| **Deposit for Stalking Horse Bid** | The DIP Lender, who is also the Stalking Horse Bidder under a separate Term Sheet, agrees to subordinate $50,000 of its priority for the DIP Obligations to the bankruptcy estate to serve as the five percent (5%) deposit for its Stalking Horse Bid. |
| **Maturity Date** | The DIP Loan shall mature on December 31, 2017, or such later date to which DIP Lender consents in writing in its sole discretion; provided that within ten (10) days after written notice by the DIP Lender to counsel for the Debtor, counsel to any Official Committee of Unsecured Creditors and the Office of the United States Trustee following the occurrence and during the continuance of any Event of Default, the DIP Facility shall terminate without further notice, motion, hearing or action of any kind. |
| **Collateral** | All Loans and all other DIP Obligations owing by the Borrower to the DIP Lender, shall, at all times: |

| | |
|---|---|
| | Super-priority: Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed super-priority administrative expense claims in each of the Bankruptcy Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 and any other provision of the Bankruptcy Code or otherwise, subject only to the Carve-Out.<br><br>Unencumbered Property: Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, perfected, first-priority security interests in and liens (the "**DIP Liens**") on all property and assets of the Borrower, and its estate, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located; all property of the estate of the Borrower within the meaning of section 541 of the Bankruptcy Code, including any commercial tort claim asserted by the Borrower, including the claims asserted by the Borrower in the Complaint filed in *Franchise Services of North America Inc. v. Michael John Silverton and Daniel Raymond Boland*, United States District Court for the Southern District of Mississippi, Civil Action No. 3:16-cv-00964-HTW-LRA, as well as the Amended Counterclaims asserted by the Borrower in *Macquarie Capital (USA) Inc. v. Franchise Services of North America. Inc.*, In the Supreme Court of the State of New York, County of New York, Index No.: 650020/2017; and all proceeds, rents and products of the foregoing (collectively, the "**Property**") that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date (or to non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to the Carve-Out.<br><br>Priming Liens: Pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to the indebtedness of the Debtor to any lien of any other lender, if any. |
| **Conditions Precedent** | Documentation for the DIP Facility will include customary conditions precedent for debtor-in-possession financings of this type, including without limitation, the entry of the Interim Order and the absence of any Event of Default or any event, circumstance or condition that, with the passage of time, would become an Event of Default. |
| **Representations and Warranties** | The Debtor shall be deemed to have made usual and customary representations and warranties for debtor-in-possession financings of |

| | |
|---|---|
| | this type relating to the Debtor, its business and its assets acceptable to the DIP Lender, including, without limitation, the representations and warranties concerning incorporation and good standing, authorization, compliance with laws, tax status and environmental compliance. |
| **Affirmative Covenants** | The Debtor shall comply with usual and customary affirmative covenants for debtor-in-possession financings of this type acceptable to the DIP Lender, including, without limitation: (i) delivery of financial reporting; (ii) provision of notices of litigation, defaults and unmatured defaults and other information (including pleadings, motions, applications and other documents filed with the Bankruptcy Court or distributed to any official committee appointed in the chapter 11 cases); (iii) payment of post-petition taxes and claims; (iv) maintenance of insurance; (v) compliance with laws; (vi) conduct of business; (vii) maintenance of books and records; and (viii) further assurances. |
| **Negative Covenants** | The Debtor shall comply with usual and customary negative covenants for debtor-in-possession financings of this type acceptable to the DIP Lender, including, without limitation, the following (in each case without the prior written consent of the DIP Lender): <br><br>(i) incurrence and repayment of indebtedness (including, without limitation, intercompany indebtedness); <br><br>(ii) incurrence of liens; <br><br>(iii) incurrence of negative pledges; <br><br>(iv) making or agreeing to make restricted payments or restricted investments (including, without limitation, intercompany payments and investments); <br><br>(v) equity issuances; <br><br>(vi) agreeing to, or effectuating, any disposition of any Property (except as permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing); <br><br>(vii) agreeing to, or effectuating any acquisition, merger, consolidation or other change of control transaction; <br><br>(viii) agreeing to, or effectuating, any fundamental changes in the business operations of the Debtor; <br><br>(ix) engaging in any new business; and <br><br>(x) agreeing to, or effectuating any sale-leasebacks. |

*EXECUTION COPY*

| | |
|---|---|
| | |
| **Funding Protections** | Customary for debtor-in-possession financings. |
| **Budget Covenant** | Prior to the Petition Date, the Debtor shall deliver to the DIP Lender a budget commencing with the week during which the Petition Date occurs and ending 13 weeks later, which budget contains line items of sufficient detail to reflect the Debtor's projected receipts and disbursements on a weekly basis for such period, and such budget shall be in form and substance satisfactory to the DIP Lender in its sole discretion (as amended, amended and restated, supplemented or otherwise modified from time to time with the prior written consent of the DIP Lender in its sole discretion, the "***Budget***").<br><br>Further, the Budget may be amended, amended and restated, supplemented or otherwise modified from time to time with the prior written approval of the DIP Lender in its sole discretion. |
| **Budget and Variance Reports and other Financial Reporting:** | The Debtor shall provide to the DIP Lender on a weekly basis, a variance report, certified by the chief financial officer of the Debtor, and in a form satisfactory to the DIP Lender, comparing actual cash disbursements and cash receipts on a line item basis for the immediately preceding week and for the cumulative period from the Petition Date to the amounts for the same weekly and cumulative periods set forth in the Budget, with a reasonably detailed explanation of the significant variances.<br><br>The Debtor shall provide to the DIP Lender on a weekly basis a rolling 13-week cash flow forecast in form and substance satisfactory to the DIP Lender and shall provide such other financial and operating reports and such other information relating to the business as the DIP Lender may request from time to time.<br><br>The DIP Lender and the Prospective Purchaser, and their respective professionals and representatives shall (i) have full and complete access to and shall be entitled to visit and inspect, any of the facilities or any assets owned or used in connection with the Debtor's business, any of the computer, accounting or operational systems owned or used in connection with the Debtor's business, and any of the books and records relating to the Debtor's business and (ii) shall be entitled to discuss any matter relating to the Debtor's business affairs, operations or the sale process with the Debtor, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested.  To the extent any affiliate of the Debtor has any facilities or assets or any computer, accounting or operational systems used in connection with the Debtor's business or any books and records relating to the Debtor's business, the DIP Lender and Prospective Purchaser (y) |

| | |
|---|---|
| | shall have full and complete access to and shall be entitled to visit and inspect, any such facilities or assets of such affiliate or any such computer, accounting or operational systems of such affiliate or any such books and records of such affiliate and (z) shall be entitled to discuss any matter relating to the Debtor's business affairs, operations or the sale process with such affiliate, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested.<br><br>The Debtor and its Board of Directors shall cooperate, and shall cause the Debtor's officers, employees, advisors and other professionals to cooperate, with the DIP Lender in connection with the exercise of its access and informational rights as set forth in the immediately preceding paragraph. |
| **Limitations on Use of DIP Loans and Cash Collateral** | Without the DIP Lender's prior written consent, none of the DIP Loans, Cash Collateral, Collateral (as defined below) or Carve-Out (as defined below) may be used for any of the following purposes:<br><br>• object to or contest the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documentation;<br><br>• seek to modify any of the rights granted under the Interim Order, Final Order or any other DIP Documentation to the DIP Lender;<br><br>• make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Budget; or<br><br>• object to, contest, delay, prevent or interfere with in any way the exercise of rights and remedies by the DIP Lender with respect to the Collateral once an Event of Default has occurred (except that Debtor may contest or dispute whether an Event of Default has occurred and the Debtor shall be entitled to any notice provisions provided in any Interim Order or Final Order). |
| **Events of Default** | In addition to customary events of default for post-petition loans, the occurrence of any of the following events, unless waived in writing by the DIP Lender shall constitute an event of default (each an "***Event of Default***") under the DIP Documentation and with respect to use of Cash Collateral:<br><br>• failure to obtain the Final Order in form and substance satisfactory to the DIP Lender by the 30th day following the Petition Date; |

|   |   |
|---|---|
|   | - filing of any motion by the Debtor seeking to obtain credit or incur indebtedness, or the obtaining of credit and incurrence of indebtedness, by the Debtor that is: (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage, or other lien in favor of the DIP Lender described in this Term Sheet, or (ii) entitled to administrative priority status which is equal or senior to the DIP Claims (other than the Carve-Out) described in this Term Sheet;<br><br>- institution of any judicial proceeding by the Debtor seeking to challenge the validity of any portion of the DIP Documentation, the DIP Obligations, or the applicability or enforceability of same or which seeks to void, avoid, limit, subordinate or otherwise adversely affect any security interest created by or in relation to the DIP Documentation;<br><br>- reversal, vacatur or modification (without the consent of the DIP Lender) of the Interim Order or Final Order;<br><br>- dismissal of the Debtor's Chapter 11 Case or conversion of any such case to a chapter 7 case;<br><br>- failure of the Debtor to comply with the Budget herein, subject to the permitted variances;<br><br>- any breach by the Debtor of any provision of the Interim Order or the Final Order;<br><br>- any disruption of the business operations of any Debtor that has a material adverse effect;<br><br>- the appointment of an interim or permanent trustee in the Debtor's Chapter 11 Bankruptcy Case or the appointment of a receiver or an examiner in such Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtor;<br><br>- the payment of, or application for authority to pay, any pre-petition claim without the DIP Lender's prior written consent or unless otherwise permitted under the first day orders acceptable to the DIP Lender;<br><br>- the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the DIP Lender, its claims or its Collateral; or |

| | |
|---|---|
| | • the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien or other interest in any Collateral. |
| **Remedies Upon Occurrence of an Event of Default** | Upon prior written notice by the DIP Lender to counsel for the Debtor, the Office of the United States Trustee (and counsel to any appointed Official Committee of Unsecured Creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), but subject to the provisions of the immediately following paragraph with respect to any enforcement action by the DIP Lender against any Collateral, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the Debtor's ability to access the DIP Loans and to use Cash Collateral; and/or (iii) exercise all default-related rights and remedies, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code or otherwise.<br><br>In addition, upon the occurrence of any Event of Default (following the expiration of any applicable grace period), and following the giving of five (5) business days' prior written notice to counsel for the Debtor, the Office of the United States Trustee (and counsel to any appointed Official Committee of Unsecured Creditors), the DIP Lender shall have relief from the automatic stay to foreclose on any or all of the Collateral and otherwise enforce its liens thereon. During such five (5) business day notice period, the Debtor and the Official Committee of Unsecured Creditors shall be entitled to any emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred or is not continuing, then (i) the automatic stay, as to the DIP Lender, shall be automatically terminated at the end of such notice period, without further notice, hearing or order, (ii) neither Section 105 nor any other provision of the Bankruptcy Code shall be utilized to preclude or restrict the DIP Lender from exercising its default-related rights and remedies, and (iii) the Debtor shall cooperate with the DIP Lender to effect an orderly liquidation of its Collateral on terms and conditions acceptable to the DIP Lender.<br><br>Without limiting the foregoing, upon the request of the DIP Lender following the occurrence and during the continuance of any Events of Default, the Debtor shall use commercially reasonable efforts to sell all or such portion of the Collateral as the DIP Lender shall specify and on such terms and conditions and pursuant to such bidding procedures as is acceptable to the DIP Lender, and remit the proceeds therefrom to the |

| | |
|---|---|
| | DIP Lender for application to the DIP Obligations, and in connection with the foregoing, the Debtor shall file and use commercially reasonable efforts to pursue one or more motions under Section 363 of the Bankruptcy Code, in form and substance satisfactory to the DIP Lender, for the entry of order(s) of the Bankruptcy Court (in form and substance satisfactory to the DIP Lender) approving bidding procedures (acceptable to the DIP Lender) governing each such sale of Collateral and approving each such sale of Collateral that has been approved by the DIP Lender. |
| **Carve-Out** | "*Carve-Out*" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a); (ii) to the extent allowed at any time, but subject in all respects to the Budget described above, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any Official Committee of Unsecured Creditors at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below); and (iii) after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any Official Committee of Unsecured Creditors in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (iii), the "*Post-Carve Out Trigger Notice Cap*"); provided, however, that notwithstanding anything to the contrary herein, the aggregate amount of fees, disbursements, costs and expenses incurred (whether before or after the delivery of any Carve Out Trigger Notice) by professionals or professional firms retained by any Official Committee of Unsecured Creditors that may be included in the Carve-Out shall not exceed $20,000. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Debtor and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Indemnification** | The Debtor shall indemnify and hold the DIP Lender and their agents and advisors (each, an "*Indemnified Person*") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, this Term Sheet the transactions contemplated thereby or hereby, in connection with responding to subpoenas (third party or otherwise) or any claim, litigation, investigation or proceeding relating to any of the |

*EXECUTION COPY*

| | |
|---|---|
| | foregoing, whether or not any of such Indemnified Person is a party thereto, except to the extent resulting from the willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Lender or Prospective Purchaser exercising discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to pay promptly the reasonable fees and expenses of such counsel. |
| **Other Terms** | 506(c) Waiver. All rights of the Debtor and its successors in interest to surcharge the Collateral under Section 506(c) of the Bankruptcy Code shall be waived effective upon entry of the Final Order.<br><br>Other Customary Terms. Other terms and conditions customary for postpetition financing of this type.<br><br>Binding Effect. The terms of any Interim Order and Final Order shall be binding on the Debtor and any successors of the Debtor, including any chapter 7 or 11 trustee. |

*[Signatures to follow on next page]*

- 11 -

*EXECUTION COPY*

**ACKNOWLEDGED AND CONSENTED TO:**

**DIP LENDER:**
**TRACE RESIDENTIAL PROPERTIES LLC**

By: *[signature: Thomas P. McDonnell III]*
Name: Thomas P. McDonnell III
Title: Managing Member

**DEBTOR:**
**FRANCHISE SERVICES OF NORTH AMERICA, INC.**

By: *[signature]*
Name: Jonathan J. Nash
Title: Chief Restructuring Officer

37096053v1

- 12 -