**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **FRANCHISE SERVICES OF NORTH** | ) | **CASE NO. 17-02316-EE** |
| **AMERICA INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor** | ) | |
| | ) | |

**APPLICATION OF THE DEBTOR PURSUANT TO 11 U.S.C. §§ 105(a), 327, AND 363(b)
TO (I) RETAIN MEADOWLARK ADVISORS LLC TO PROVIDE THE DEBTOR
WITH A CHIEF RESTRUCTURING OFFICER, AND (II) DESIGNATE
JONATHAN J. NASH AS CHIEF RESTRUCTURING OFFICER
FOR THE DEBTOR *NUNC PRO TUNC* TO JUNE 26, 2017**

Franchise Services of North America Inc., the Debtor and debtor-in-possession herein

("**Debtor**" or the "**Company**" or "**FSNA**"), by and through its undersigned attorneys, files this

*Application of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to (I) Retain Meadowlark*

*Advisors LLC to Provide the Debtor with a Chief Restructuring Officer, and (II) Designate*

*Jonathan J. Nash as Chief Restructuring Officer for the Debtor Nunc Pro Tunc to June 26, 2017*

(the "**CRO Application**"), pursuant to the terms and conditions of that certain letter agreement

between Meadowlark Advisors LLC ("**Meadowlark**" or the "**Firm**") and the Debtor (the

"**Engagement Letter**"), dated effective as of June 20, 2017 (the "**Retention Date**"), as the

Engagement Letter may be modified by any Order approving this CRO Application.  In this

CRO Application, the Debtor seeks to (a) retain Meadowlark to provide the Debtor with a Chief

Restructuring Officer (the "**CRO**")[1] from and after the Retention Date through December 31,

2017, and (b) retain Jonathan J. Nash ("**Nash**") as the CRO for the Debtor *nunc pro tunc* to June

20, 2017.  In support thereof, the Debtor states as follows:

---

[1] A true and correct copy of the Engagement Letter is attached hereto as __Exhibit A__ and is incorporated herein by reference.  All capitalized terms not otherwise defined herein shall have the meanings given to them in the Engagement Letter.  In the event of any inconsistencies between the description of the Meadowlark engagement described in this CRO Application and the terms of the Engagement Letter, the Engagement Letter shall control.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105(a), 363(b), 1107(a), 1108 and other applicable sections of the United States Bankruptcy Code.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

2.      On June 26, 2017 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief, and thereby commenced a case (the "*Bankruptcy Case*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Southern District of Mississippi (the "*Bankruptcy Court*").  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as debtor-in-possession. No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has been established.

3.      The Debtor is a Delaware limited liability company with its principal place of business at 1052 Highland Colony Parkway, Suite 204, Ridgeland, Mississippi.

4.      Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the *Declaration of Thomas P. McDonnell, III, in Support of the Debtor's Chapter 11 Petition and First Day Pleadings and Applications* [Dkt. # 7] (the "*McDonnell Declaration*") which is incorporated herein by reference.

5.      The Debtor and its professionals are familiar with the professional standing and reputation of Meadowlark and of Nash, whom the Debtor recognizes as having experience and resources to provide consulting services in restructurings and reorganizations and who enjoys an excellent reputation for turnaround services rendered in bankruptcy cases on behalf of debtors and creditors throughout the United States.  Nash has substantial experience in providing

restructuring and reorganization services, previously as a Managing Partner of CRG Partners and also as a Restructuring Principal of Deloitte Transactions and Business Analytics LLP, and also currently as the Managing Partner of Meadowlark.  Nash also has extensive international experience and, having lived in China, has managed companies in the Pacific Rim, the Middle East, China, and Europe.  With more than 15 years of senior-management experience in a broad mix of companies, Nash has extensive experience providing strategic leadership in crisis situations, solving short-term cash related issues, and implementing financial planning, budgeting, and expense control.

6.     Nash's notable bankruptcy or restructuring engagements include functioning as CRO or CEO for: Mississippi Phosphates Corporation and subsidiaries (CRO in a Chapter 11)[2]; TMP Directional Marketing (CRO in a Chapter 11); and Western Non-Wovens (CEO in a Chapter 11).

7.     Significantly, Meadowlark was engaged, effective as of June 20, 2017, by FSNA (the "***Prior Engagement***") as a consultant to FSNA.  Meadowlark agreed to provide FSNA with a CRO in the event that FSNA filed a Chapter 11 case, and Nash was selected to serve as the CRO of the Debtor in the event of such a filing.

8.     On June 22, 2017, Meadowlark was provided with a retainer in the amount of $50,000.00 to cover fees and expenses under the Prior Engagement at the same rates as are proposed for it herein, plus reasonable expenses.  Meadowlark's Prior Engagement concluded on the Petition Date.  As of the Petition Date, all fees and amounts owed to Meadowlark in

---

[2] In *In re Mississippi Phosphates Corporation, et al.*, in the United States Bankruptcy Court for the Southern District of Mississippi, Case No. 14-51667-KMS, Meadowlark and Nash served as the CRO for the Debtors and worked with Butler Snow, LLP, counsel for the Debtor herein, in Butler Snow LLP's role as Debtors' counsel in those bankruptcy cases.

connection with the Prior Engagement were paid in full, and the balance in the retainer remained in the amount of $50,000.00 as of the Petition Date.

## APPLICATION

### I.    The Meadowlark Advisors LLC Engagement Pre-Petition

9.    Nash has served as a consultant to FSNA since June 20, 2017, and his background and knowledge of the Debtor will be beneficial to the bankruptcy estate in the Bankruptcy Case going forward.

### II.    Terms of Engagement

10.    Subject to this Court's approval, pursuant to the terms of the Engagement Letter, Meadowlark agreed to provide the Debtor with a Chief Restructuring Officer, with Nash to serve in that capacity.  The CRO, assisted by other personnel of Meadowlark as necessary (*see* http://meadowlarkadvisors.com/the-mla-team), is anticipated to provide the following services (the "*Services*"), as requested by the Debtor and agreed to by Meadowlark:[3]

- Assess the Company's current business plan, holdings, and claims and causes of action to identify areas of opportunity, including, but not limited to, potential profitability, ongoing cash requirements, and operations;

- Develop the Company's financial and operational strategy and associated activities for the Board's input and approval;

- Oversee the implementation of the Company's Board-approved financial and operational strategy;

- Coordinate and consult with the Company's business broker / investment banker with respect to the Chapter 11 sales process with respect to potential sale of the Company's assets by potential buyers;

- Oversee the relationship with the Company's creditors;

- Oversee the management of, and effort to enhance, the Company's liquidity issues;

---

[3] The summary of the terms of the Engagement Letter set forth in this CRO Application is for convenience only.  Except as set forth below, to the extent of any discrepancies between such summary and the terms of the Engagement Letter, the Engagement Letter shall govern.

- Meet with the Board on a periodic basis to discuss, among other things, engagement progress and financial and operational reports;

- Oversee the implementation of Board-approved bankruptcy efforts of the Company, including being the Company's witness in the Bankruptcy Court on matters incident to the Company's Bankruptcy Case; and

- Perform the day-to-day functions customarily and reasonably associated with the position of a chief restructuring officer in companies of similar size and complexity as the Company.

Meadowlark also shall provide such other services as may be agreed to by Meadowlark and the Company in writing based on discussions with the Board of Directors of the Debtor as the engagement (the "***Engagement***") progresses and additional information is obtained during the course of the engagement.

11.    Upon approval of its retention, Meadowlark will report to, and receive direction from, the Board of Directors of the Debtor.  Moreover, Nash will act under the direction, control, and guidance of the Board of Directors of the Debtor as long as he remains as the CRO.

### III.    Fees and Expenses

12.    As set forth in the Engagement Letter, the rates Meadowlark would charge for its Engagement are as follows:

(a)    Fees.  Meadowlark's professional fees for the Engagement including the CRO function will be on an hourly basis.  Meadowlark's professional fees for the Services, to the extent provided, will be at the rate of $175 to $625 an hour, depending on the personnel assigned to the particular tasks.  No other Services, however, shall be provided to the Debtor without prior consultation with and approval by the Debtor and a prior agreement to include such fees in the Approved Budget as referred to in the Engagement Letter and to ensure the Debtor's ability to fund such fees.

(b)     _Expenses_.  Meadowlark will be entitled to reimbursement of reasonable expenses incurred in connection with this Engagement, including travel, meals and lodging, and delivery services.

(c)     _Payment_.  All fees and expenses will be billed to Company monthly and are payable upon receipt, subject to the understanding that Meadowlark may agree to adjust this requirement to any interim billing and payment protocol upon approval by the Court.

## IV.     Indemnification

13.     The Debtor shall indemnify and hold harmless Nash, Meadowlark, its subsidiaries and subcontractors, and their respective personnel, including the CRO (collectively, the "**_Indemnified Parties_**") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees, and expenses incurred by any of the Indemnified Parties in connection with, arising out of or related to (whether from direct claims or third party claims) the Engagement, as more particularly set forth in the Engagement Letter (the "**_Indemnification Agreement_**"), except to the extent resulting from the bad faith or intentional misconduct of Meadowlark or its subcontractors.  In addition to the above indemnification, the CRO will receive the benefit of the most favorable indemnification and exculpation provisions provided by the Debtor to its directors, officers and similar employees pursuant to the Debtor's corporate charter and by-laws, by contract, by applicable law or otherwise.

14.     The Debtor asserts that the terms of the Engagement Letter, including without limitation, the fee provisions, and the indemnification provisions, are reasonable terms and conditions of employment and are approved; provided, however, that during the pendency of this Bankruptcy Case, all requests of Meadowlark for payment of indemnity, contribution or

otherwise pursuant to the Engagement Letter shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Engagement Letter and amounts asserted for indemnification thereunder are reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, and <u>further provided</u>, notwithstanding the terms of the Engagement Letter, the Debtor and Meadowlark have agreed that in no event shall an Indemnified Party be indemnified or receive contribution thereunder if the Debtor or its bankruptcy estate or any statutory committee of unsecured creditors appointed in the Bankruptcy Case (i) asserts a claim against an Indemnified Party <u>and</u> (ii) to the extent the Court determines by final order that such claim resulted from the bad-faith, self-dealing, breach of fiduciary duty (if any and only to the extent such breach does not constitute ordinary negligence), gross negligence or willful misconduct on the part of that Indemnified Party.

15.     The Debtor believes that the indemnity provisions described therein are reasonable terms and conditions of Meadowlark's Engagement.  Further, courts generally hold that exculpation and indemnification clauses are permissible in retention agreements if the clauses are reasonable.  Also, because such indemnification clauses do not exclude liability for gross negligence or willful misconduct, but merely restate the standard of care already in effect, they have been held to be unobjectionable, whether in a retention agreement or as a plan provision.  *See*, *e.g.*, *In re United Artists Theatre Co.*, 315 F.3d 217, 230 (3d Cir. 2003); *In re Friedman's, Inc.*, 2005 Bankr. LEXIS 3140 (Bankr. S.D. Ga. Nov. 23, 2005); *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005); *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000); *In re Firstline Corp.*, 2007 Bankr. LEXIS 286 (Bankr. M.D. Ga. Jan. 25, 2007).

16.     These indemnity and expense reimbursement obligations: (i) will be in addition to any liability the Debtor may have to Meadowlark at common law or otherwise; (ii) will survive the expiration of Meadowlark's Engagement and the termination of this Bankruptcy Case or any case into which it may be converted; (iii) will apply to any modification of Meadowlark's Engagement and would remain in full force and effect following the completion or termination of the Engagement as amended or modified; and (iv) will be binding on any successor or assign of the Debtor.

17.     The Debtor believes that the indemnity provisions described herein are reasonable terms and conditions of Meadowlark's Engagement and were, along with all terms of the Engagement Letter, negotiated by the Debtor and Meadowlark at arm's-length and in good faith. Meadowlark and the Debtor believe that the indemnity provision is comparable to those indemnification provisions generally obtained by restructuring management firms of similar stature to Meadowlark and for comparable engagements, both in court and out of court. The Debtor respectfully submits that the indemnification provisions contained in the Indemnification Agreement, viewed in conjunction with the other terms of Meadowlark's proposed retention, are reasonable and in the best interests of the Debtor, the bankruptcy estate and creditors in light of the fact that the Debtor requires Meadowlark's services to maximize the value of the bankruptcy estate.

## V.     Framework of the Engagement; Limitations on Scope of Engagement

18.     The Engagement will not constitute an audit, review or compilation, or any other type of financial reporting engagement subject to the rules of the AICPA or other such state and national professional bodies.

## VI.    Reporting Requirements

19.    To maintain transparency, Meadowlark will serve on the Debtor and the United States Trustee and such other parties as the Court may require (collectively, the "***Notice Parties***") monthly requests for compensation earned and expenses incurred pursuant to such interim compensation procedures as the Court may approve, and will apply to the Court on at least a quarterly basis for the allowance of fees and expenses for the applicable quarter.

## VII.    Dispute Resolution Procedures

20.    The Debtor and Meadowlark have agreed, subject to the Court's approval of this CRO Application, that any controversy or claim between the parties arising out of or relating to this Engagement Agreement, or this Engagement (a "***Dispute***") shall be resolved by mediation or binding arbitration as is set forth in the applicable provisions of the Engagement Letter.

## LEGAL BASIS FOR RELIEF REQUESTED

21.    Section 327 of the Bankruptcy Code authorizes the employment of professional persons by the Debtor to assist the Debtor in carrying out its duties.  Further, Section 363(b) of the Bankruptcy Code provides that, after notice and a hearing, a debtor may use property of the estate other than in the ordinary course of business.  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Safety-Kleen Corp.*, No. 00-02303 (Bankr. D. Del. 2000); *In re Rangers Equity Holdings LP*, No. 10-43624 (Bankr. N.D. Tex. 2010); *In re Rangers Equity Holdings GP LLC*, No. 10-43625 (Bankr. N.D. Tex. 2010).

22.     Courts have determined that retention of a chief restructuring officer is an appropriate exercise of a debtor's business judgment.  *See*, *e.g.*, *In re Residential Capital, LLC*, 504 B.R. 358 (Bankr. S.D. N.Y. 2014).

### I.     The Debtor Has Exercised Sound and Prudent Business Judgment

23.     Entry into the Engagement Letter and retaining Nash as the CRO upon the terms set forth in the Engagement Letter, this CRO Application, and any Order approving this CRO Application will enable the Debtor to retain an experienced bankruptcy professional to ensure the most efficient manner in which to maximize value of the bankruptcy estate.  The Debtor believes that it is in its best interests and in the best interests of the bankruptcy estate, the creditors, and other parties-in-interest for the Court to approve the Engagement Letter and the retention of Meadowlark and Nash as CRO in accordance with the Engagement Letter, with such retention being deemed effective as of June 26, 2017.

24.     The Debtor believes that Meadowlark's fee structure is fair and reasonable in light of the type of services being provided and is comparable to those generally charged by firms of similar stature to Meadowlark for comparable engagements.  In addition, given the numerous issues Meadowlark may be required to address in this Bankruptcy Case, Meadowlark's commitment to the variable level of time and effort necessary to address all such related issues as they arise, and the market prices for Meadowlark's services for engagements of this nature in an out-of-court context, the Debtor believes that the Meadowlark fee arrangement described above is fair and reasonable.

### II.     The Proposed Retention Comports with the Bankruptcy Code

25.     Meadowlark will provide the Notice Parties with the required information concerning its compensation, all of which is ultimately subject to approval by the Bankruptcy Court.  The Debtor is seeking to retain Meadowlark and Nash pursuant to Section 327 of the

Bankruptcy Code. The fees and expenses of Meadowlark incurred in the performance of the above-described services will be treated as an administrative expense of the Debtor's bankruptcy estate and are to be paid by the Debtor pursuant to the professional fee procedures approved by the Court as described above.

26. To the best of the Debtor's knowledge, information, and belief, Meadowlark is disinterested and does not have any interest materially adverse to the Debtor, the bankruptcy estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason. Further, to the best of the Debtor's knowledge, information, and belief, Meadowlark has no connection with the Debtor, its creditors, or any other party-in-interest, except as disclosed in the Nash Declaration.

27. Additionally, the Court's general equitable powers codified in Section 105(a) of the Bankruptcy Code provide ample authority for the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." *See* 11 U.S.C. § 105(a); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code."); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 166 (D.N.J. 2005) (reciting the power of the bankruptcy court to " . . . issue any order . . . that is necessary or appropriate to carry out the provisions of . . . [title 11]").

### III.     *Nunc Pro Tunc* Retention

28. The Debtor submits that retroactive retention of Meadowlark is appropriate under the circumstances because, as described above: (i) Meadowlark does not have any interest

- 11 -

materially adverse to the Debtor, the bankruptcy estate, or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason; and (ii) *nunc pro tunc* retention is appropriate in this case since the Debtor needs day-one assistance from Meadowlark in carrying out its duties in this Chapter 11 case.  Meadowlark and Nash will properly focus on stabilizing the Debtor's business following the bankruptcy filings and in preserving the value of the bankruptcy estate.  *See*, *e.g.*, *In re Ark. Co.*, 798 F.2d 645, 650 (3d Cir. 1986).

29.    Accordingly, for the reasons set forth above, the Debtor submits that entering into the Engagement Letter is a sound and prudent exercise of its business judgment, and it believes that the approval of the Engagement Letter, and of the retention of Meadowlark and Nash as CRO *nunc pro tunc* to June 26, 2017, is in its best interests and the best interests of the bankruptcy estate, creditors, and other parties-in-interest.

30.    The Debtor submits that the requested relief is a sound and prudent exercise of its business judgment and is in its best interests and that of the bankruptcy estate, its creditors, and all other parties-in-interest.

WHEREFORE, the Debtor respectfully requests that this Court enter an order approving the Debtor's retention of Meadowlark Advisors LLP to provide the Debtor with a Chief Restructuring Officer, and to Designate Jonathan J. Nash as the Chief Restructuring Officer for the Debtor *Nunc Pro Tunc* to June 26, 2017, all pursuant to the terms and conditions of the Engagement Letter, and to such other and further relief as may be just and proper under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 27, 2017.

Respectfully submitted,

**FRANCHISE SERVICES OF NORTH AMERICA INC.**


By: _s/ Stephen W. Rosenblatt_
Stephen W. Rosenblatt (Miss. Bar No. 5676)
Christopher R. Maddux (Miss. Bar No. 100501)
J. Mitchell Carrington (Miss. Bar No. 104228)
Thomas M. Hewitt (Miss. Bar No. 104589)
BUTLER SNOW LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: (601) 985-4415
Steve.Rosenblatt@butlersnow.com
Chris.Maddux@butlersnow.com
Mitch.Carrington@butlersnow.com
Thomas.Hewitt@butlersnow.com

ATTORNEYS FOR THE DEBTOR

## **CERTIFICATE OF SERVICE**

I certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically and was separately served by e-mail on the following:

Ronald H. McAlpin, Esq.
Trial Attorney, Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS  39201-5002
Ronald.McAlpin@usdoj.gov

Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201-5002
USTPRegion05.AB.ECF@usdoj.gov

The 20 Largest Unsecured Creditors identified on the attached **Exhibit B**.

SO CERTIFIED, this the 27th day of June 2017.

*/s/ Stephen W. Rosenblatt*
STEPHEN W. ROSENBLATT

## Exhibit A

*Engagement Letter*

# MEADOWLARK ADVISORS

June 20, 2017

Mr. Thomas P. McDonnell, III
Chief Executive Officer
Franchise Services of North America, Inc.
1052 Highland Colony Parkway
Suite 204
Ridgeland, MS 39157

Dear Mr. McDonnell:

This letter will confirm our agreement concerning the engagement by Franchise Services of North America, Inc.(the "Company") of Meadowlark Advisors LLC, a Texas limited liability company ("MLA"). This letter, along with the terms and conditions set forth in the attached Appendix, which is hereby incorporated by reference, shall be collectively referred to as the "Agreement". This Agreement shall be effective as of the date set forth above (the "Effective Date").

**Services.** As of the Effective Date, Company agrees to hire MLA for the purposes of providing business advice and consultation to the Company regarding the Company's current challenges and to implement strategies appropriate to achieve the Company's objectives (the "Services"). The Services will include the following:

From and after approval by the Board of Directors of the Company, and throughout the Term of this Agreement unless otherwise agreed, in writing, by the Parties, Jonathan Nash of MLA is appointed to serve as the Company's Chief Restructuring Officer (the "CRO").

As part of the Services, the CRO will have the following role with the Client:

- Report directly to the Board of Directors of Client (the "Board"), and make recommendations to the Board and consult with them regarding the Services;

- Work on a collaborative basis with the Board to develop plans and alternatives to formulate and implement the chapter 11 Plan of the Client and other related matters; and

- In consultation and coordination with the Board, to coordinate and manage the Services, including the performance of the Services by the CRO.

- The CRO shall operate under the direction of the Board. Accordingly, the CRO shall have no liability to Client for any actions taken at the direction of, or which have been approved by the Board, except as set expressly forth herein.

MLA and the CRO will provide the following Services, only as requested by the Board and agreed to by CRO:

- Assess Client's current business plan, holdings, and claims and causes of action to identify areas of opportunity, including, but not limited to, potential profitability, ongoing cash requirements, and operations;

- Develop Client's financial and operational strategy and associated activities for the Board's input and approval;

- Oversee the implementation of Client's Board-approved financial and operational strategy;

- Coordinate and consult with Client's business broker / investment banker with respect to the chapter 11 sales process with respect to potential sale of Client's assets by potential buyers;

- Oversee the relationship with Client's creditors;

- Oversee the management of, and effort to enhance, Client's liquidity issues;

- Meet with the Board on a periodic basis to discuss, among other things, engagement progress and financial and operational reports;

- Oversee the implementation of Board-approved bankruptcy efforts of the Client, including being the Client's witness in the bankruptcy court on matters incident to the Client's bankruptcy cases; and

- Perform the day to day functions customarily and reasonably associated with the position of a chief restructuring officer in companies of similar size and complexity as the Client.

37024106v2

1

Company's Initials

# ᴹᴱᴬᴰᴼᵂᴸᴬᴿᴷ ADVISORS

If during the course of this Agreement, the Company asks MLA to seek new financing sources, restructure its existing debt, find merger partners and/or buyers for the Company's assets or stock or otherwise assist the Company in connection with any such transaction, such services will not be included in the Services hereunder and will be covered by a separate written agreement.

**Compensation.** Various personnel of MLA will perform the Services at varying hourly rates (the "Rates"), which Rates shall be given to Company upon request, but which shall be subject to change with prior notice to the Company. The Rates will vary between $175-$625 per hour and Jonathan Nash's rate will be $550 per hour. The Company shall pay professional fees to MLA for the Services at the applicable hourly Rate(s) of the personnel performing the Services (the "Fees") plus 4.5% of the Fees to cover administrative expenses such as telephone, computer and copying services (the "Administrative Fees"). In addition, Company shall pay all of MLA's out of pocket expenses incurred during performance of the Services, including but not limited to travel, meals and lodging, and delivery services ("Expenses"). To the extent MLA is spending time travelling on behalf of the Company but is not simultaneously performing the Services, MLA shall only charge 50% of the Fees during such travel time. All Fees, Administrative Fees, Expenses, and Success Fees (if applicable) shall be immediately due and payable upon performance or occurrence on a cash on delivery basis and shall be immediately paid by Company upon invoice request by MLA. In states where MLA is obligated to collect sales taxes on professional services, such taxes will be included on the invoice.

**Retainer.** Upon execution of this Agreement, Company shall pay MLA a non-refundable retainer (the "Retainer") in the amount of $50,000 (the "Required Amount"), which shall be a Minimum Fee for the engagement. This Retainer will be held by MLA and applied to MLA's final bill for fees and expenses hereunder and shall otherwise be used as provided herein. Company agrees that the amount of the Retainer is intended to be greater than the combined amount of Fees, Administrative Fees and Expenses due to or incurred by MLA under this Agreement at any given time. If the Company fails at any time or for any reason to pay any amounts due under this Agreement, including but not limited to the Fees, the Administrative Fees, the Expenses, any Success Fee (if any) and any other costs or expenses due pursuant to this Agreement, then MLA may apply the Retainer to such unpaid amounts immediately and without prior notice to the Company. The Company hereby grants a first-priority security interest in the Retainer to MLA to secure payment to MLA of all amounts due under this Agreement. Company shall have a continuing obligation to replenish the Retainer and maintain it at the Required Amount within three (3) days of any request by MLA, and MLA shall have a first-priority security interest in any additional amounts added to the Retainer to maintain the Required Amount.

**Term and Termination.** This Agreement shall be effective as of the Effective Date and shall remain in effect until completion of the Services unless sooner terminated as provided herein. Either party may terminate this Agreement prior to completion of the Services by providing notice, in which case termination shall be effective upon receipt of notice by the other party. Upon termination of the Agreement prior to completion of the Services by either Party, MLA shall submit a final invoice including all Fees, Administrative Fees, Success Fees (if applicable) and Expenses incurred prior to the date of termination. Upon full and complete payment of all amounts due incurred during the term of this Agreement, MLA shall return any unapplied portion of the Retainer. Termination or expiration of this Agreement shall not affect any rights or obligations that the Parties have relating to Indemnification, Independent Contractor Status, Termination, Insurance Coverage under the Policies and as otherwise required under this Agreement, Confidentiality, Use of MLA's Work Product, Disclaimer of Warranties and Limitation of Liability, Non-solicitation and Right of Set Off, all of which shall survive termination or expiration.

**Independent Contractor Status.** MLA is an independent contractor under this Agreement, and accordingly, this Agreement shall not be an employment agreement. No one on behalf of MLA, any of MLA's Affiliates (as hereafter defined), or the respective directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, independent contractors, attorneys, agents, successors or assigns of MLA or MLA's Affiliates (all of the foregoing collectively, the "MLA Parties," and each a "MLA Party") shall be considered to be a director, officer, member, manager, partner, control person, employee, representative, agent, or insider of the Company, unless expressly agreed to in a writing signed by Company and MLA. As an independent contractor, MLA will have exclusive control over the management and operation of MLA, including hiring and paying the wages or other compensation of its personnel. Unless expressly provided otherwise in the Services, the MLA personnel that provide Services to the Company under this Agreement may also provide services to other past, present or future MLA clients in connection with unrelated matters. In addition, MLA may utilize the services of its own employees or services of qualified independent contractors to perform the Services contemplated in this Agreement. For purposes of this Agreement, "Affiliate" shall mean an individual, partnership, joint venture, corporation, trust, limited liability company, estate or other legal entity or organization (collectively "Person") (i) which is directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question, or (ii) in which the Person in question is a manager, officer, director or has a financial interest. The term "control," as used in the immediately preceding sentence, means, with respect to an entity that is a corporation, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares of such corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

**Appointment as Officer and/or Director.** Company represents and warrants that Company's officers and directors are covered by appropriate D&O insurance policies to provide sufficient coverage for such officers and directors (the "Policies"), terms and copies of which shall be provided to MLA upon request. Should the Company and MLA agree, in writing, that a MLA representative will be elected as an officer or director, the Company agrees to name such MLA representative and MLA as additional insureds under the Policies. It is mutually understood that in naming such MLA representative as an officer or director of the Company, that such MLA representative will remain at all times an employee of MLA and will be compensated solely by MLA. Such MLA representative will not become an employee of the Company, and will have the same independent contract status as set forth above.

**Indemnification.** As part of the consideration for the agreement of MLA to furnish the Services, the Company agrees to indemnify and hold harmless MLA and the MLA Parties (each, an "Indemnified Party") to the fullest extent lawful from any and all claims, liabilities, losses, damages and expenses (or actions in respect thereof), as incurred, related to or arising out of or in connection with or related to this Agreement, including, without limitation, any and all of such Indemnified Parties' reasonable expenses incurred in connection with investigating, preparing, defending or settling any action or claim arising from or relating to such liabilities, including all of such Indemnified Parties' legal fees and expenses. The indemnity and expense reimbursement obligations set forth herein (i) shall be in addition to any liability the Company may have to MLA at common law or otherwise, (ii) shall survive the expiration of this Agreement, (iii) shall apply to any modification of MLA's engagement hereunder and shall remain in full force and effect following the completion or termination of the engagement as amended or modified, and (iv) shall be binding on any successor or assign of the Company and its successors or assigns.

37024106v2

2

Company's Initials ___

# ▨MEADOWLARK ADVISORS

If this Agreement accurately sets forth the understanding between us, please so indicate by signing this letter and the appendix and returning the enclosed copy to me. By signing this letter, you represent and warrant that Company has the authority to enter into this engagement letter. I very much appreciate the opportunity to present this Agreement to you and look forward to working with you!

Very truly yours,

_____     Date: _____

Meadowlark Advisors, LLC
By:  Jonathan Nash

Agreed and accepted:

Franchise Services of North America, Inc.   Date:   6/22/17

Franchise Services of North America, Inc.
By:  Thomas P. McDonnell, III

3

Company's Initials _____



**Appendix**

**Access to Company Personnel and Information and Company Representation Concerning Information Provided to MLA.**
The Company will provide MLA with full access to all Company personnel, books, and records, including those of the Company's attorneys and other agents and third-party representatives. The Company also represents and warrants to MLA that, except as disclosed to MLA in writing, all information provided or made available to MLA by the Company, its directors, officers, employees, representatives and agents at any time shall, to the best of the Company's knowledge: a) be complete and correct in all material respects; and b) not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements not misleading in light of the circumstances under which such statements are made. Company agrees that it shall immediately notify MLA if it learns subsequently that any information provided or made available to MLA in accordance with this Agreement is incorrect, inaccurate, or otherwise should not be relied upon.

The Services may include the preparation of recommendations, projections, and other forward-looking statements. The Company acknowledges that numerous factors may affect the Company's actual financial and operational results, and that these results may materially and adversely differ from the recommendations and projections prepared, in whole or in part, by MLA. The Company acknowledges that in rendering the Services, MLA will be using and relying upon the information provided by Company, its directors, officers, employees, representatives and agents. Under any of the foregoing circumstances, the Company agrees that MLA shall have no duty to verify independently the reliability, accuracy or completeness of such information. The Company also agrees that MLA shall incur no liability to the Company or any individual or other entity that may arise if any such information proves to be unreliable, inaccurate or incomplete.

**Confidential Information.**
MLA shall not intentionally disclose the Company's "Confidential Information." Further, MLA will use the Confidential Information only for the purpose of providing services to the Company pursuant to this Agreement. "Confidential Information" shall consist only of information that is necessary for MLA to perform the Services under this Agreement, and that is: (i) disclosed to MLA by the Company, its directors, officers, employees, representatives, and agents; (ii) acquired by MLA from any inspection of the Company's property in connection with this Agreement; or (iii) information produced by MLA, from Confidential Information, in connection with providing services to the Company under this Agreement.
Confidential Information shall not include information that is: (i) now or subsequently becomes generally known or available by publication, commercial or otherwise, through no fault of MLA, its employees, agents, or independent contractors; (ii) already known by MLA at the time of the disclosure, provided that such information did not come from a source known by MLA to be bound by a confidentiality agreement with the Company, or from a source that was otherwise prohibited from disclosing such information under a contractual, legal or fiduciary obligation; (iii) becomes available to MLA on a non-confidential basis from a source other than the Company, provided that, to MLA's knowledge, the source was not prohibited from disclosing such information to MLA under a contractual, legal or fiduciary obligation to the Company; (iv) independently developed by MLA, its employees, agents, or independent contractors primarily from information that is not Confidential Information; (v) information that the Company and MLA agree, orally or in writing, may be disclosed; (vi) information that is reasonably expected to be disclosed as part of MLA's Services; or (vii) information that MLA reasonably believes, after consultation with its attorneys, it must disclose pursuant to applicable law, or regulatory or administrative process, including stock exchange rules.

MLA may make reasonable disclosures of Confidential Information: (i) to third parties in connection with the performance of the Services so long as such disclosures are made pursuant to a confidentiality agreement in form and substance satisfactory to the Company; or (ii) in connection with any dispute between MLA and Company under or concerning this Agreement. If MLA receives any request by order, subpoena, or other legal process to produce any Confidential Information, then unless otherwise prohibited by law or process, MLA will use its best efforts to provide the Company with timely notice of such request. At the Company's request and expense, and unless otherwise prohibited by law or against a recommendation by MLA's counsel, and without relinquishing or modifying MLA's authority to disclose information under the terms of this Agreement, MLA will cooperate reasonably with the Company in actions that the Company deems necessary or appropriate under the circumstances to protect the confidentiality of the Confidential Information. Notwithstanding anything in this Agreement to the contrary, Company agrees that MLA shall have the right to use the Company's name and logo, and to provide a description of the services provided by MLA under this Agreement, in MLA's public marketing materials.

**No Third-Party Beneficiaries; Use of MLA's Work Product by Company.**
The Company acknowledges that all information, whether written or oral, created, prepared, or compiled by MLA in connection with this Agreement is intended solely for the benefit and use of the Company. No other individual or entity shall be entitled to rely on such information for any purpose. Company agrees that such information shall not be reproduced, disseminated, quoted or referred to at any time or in any manner other than confidentially to the Company's board of directors, officers, employees, representatives, attorneys, and other agents who have a need to receive such information, except upon MLA's prior written consent. Without limiting the foregoing, the Company shall not (and shall not authorize any other individual or entity to) use MLA's name or to make available to third parties any information created, prepared, or compiled by MLA under this Agreement for any reason, including obtaining or extending credit, offering or selling securities or other assets, or in any representations to third parties without MLA's prior written consent. It is also expressly agreed that notwithstanding the above restrictions upon the Company's dissemination and use of information and work product, MLA shall have no responsibility or liability relating directly or indirectly to such disclosure (whether authorized or unauthorized) by the Company concerning any information created, prepared, or compiled, in whole or in part, by MLA pursuant to this Agreement, which may be disclosed only after prior written approval by MLA or as required by applicable law, or regulatory or administrative process, including stock exchange rules. The foregoing provisions shall not be construed or interpreted to prohibit references to MLA's engagement under this Agreement in required public filings or court documents.

**No Fiduciary Relationship.**
Other than with respect to appointment(s) of a MLA Party as an officer and/or director of Client in writing, and otherwise in accord with the provisions of this Agreement, nothing in this Agreement is intended to create, or shall be deemed or construed to create a fiduciary relationship between: (a) the Company, including without limitation, the Company's directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, agents, or creditors, on the one hand; and (b) the MLA Parties on the other hand.

Company's Initials ___

37024106v2

# ⧅ MEADOWLARK ADVISORS

**Disclaimer of Warranty and Limitation of Liability.**
MLA EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE. MLA WILL NOT BE RESPONSIBLE OR LIABLE FOR ANY INJURY, LOSS, CLAIM, DAMAGE, OR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR LOST SAVINGS), WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, THAT ARISES OUT OF OR IS IN ANY WAY CONNECTED WITH THE SERVICES. MLA's TOTAL LIABILITY IN ANY CASE ARISING UNDER THIS AGREEMENT SHALL NOT EXCEED THE FEES PAID BY THE COMPANY, WHICH SHALL BE COMPANY'S EXCLUSIVE REMEDY.

**Alternative Dispute Resolution Procedure.**
The parties agree that except for claims or disputes where the Company, or any individual or other entity comprising the Company, files a voluntary bankruptcy under title 11 of the United States Code, or has an involuntary bankruptcy petition under title 11 of the United States Code filed against it, the parties shall attempt to settle any claim or controversy arising out of or relating to this Agreement through consultation and negotiation in good faith and a spirit of mutual cooperation. However, at any time before or during such negotiations, or following any unsuccessful negotiations, any party may by written notice to the other(s) demand that the dispute be submitted to mediation. When such a demand is made, the parties shall within ten (10) days jointly make arrangements for the mediation of the dispute within the city of Austin, Texas with a mediator to be jointly agreed upon by and between the parties to the dispute (which mediator shall have at least ten (10) years' experience resolving commercial disputes), or if no such agreement shall be reached, each party shall appoint one mediator in Austin, Texas with such qualifications, and the mediators selected by the parties in turn shall select a third mediator having such qualifications, who shall be the mediator that shall mediate the dispute between the parties. The mediation shall be conducted pursuant to the rules of Judicial Arbitration and Mediation Services, Inc. ("JAMS") or its successor, whose Mediation Guide in effect on the date of the written demand for mediation shall govern the mediation in all respects, except as modified by agreement of the parties. If the dispute has not been resolved within sixty (60) days after any written demand for mediation, or within a longer time period to which the parties may agree, the dispute shall be submitted to binding arbitration. Such binding arbitration shall be conducted within the city of Austin, Texas in accordance with the then-current JAMS Arbitration Guidelines and Rules by a single arbitrator selected by mutual agreement of the parties, or by the mediator selected in the manner described above if the parties cannot agree, within twenty (20) days after the date of submission of the dispute to binding arbitration, or in the absence of such agreement, such selection to be made by JAMS in accordance with the procedures outlined in JAMS Arbitration Rules. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 (as may be amended). The decision of the arbitrator shall be in writing setting forth the findings of fact and conclusions of law and the reasons supporting the decision and shall be final and binding and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof, except that both parties shall have the right to appeal to the appropriate court any errors of law in the decision rendered by the arbitrator. The arbitrator is empowered to award attorneys' fees but is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover such damages with respect to any dispute arising out of or relating to this Agreement.
NOTWITHSTANDING THE FOREGOING, BUT SUBJECT TO THE PARTIES' AGREEMENT TO SUBMIT DISPUTES INITIALLY TO MEDIATION AND ARBITRATION, THIS AGREEMENT AND ALL MATTERS RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS, AND ALL OBLIGATIONS OF ONE MEMBER TO ANOTHER ARE DEEMED TO BE PERFORMABLE IN TRAVIS COUNTY, TEXAS. EXCLUSIVE JURISDICTION AND VENUE FOR DISPUTES BETWEEN THE PARTIES SHALL LIE IN THE COURTS OF TRAVIS COUNTY, TEXAS.

**Non-Solicitation.**
During the term of this Agreement and for a period of six (6) months after termination of this Agreement, the Company, including any affiliates thereof, shall not hire, retain or utilize (other than through MLA) the services of any current or former employee of MLA or independent contractor who provided services under this Agreement at any time. The Company agrees and acknowledges that MLA's remedy at law for any breach of the provisions of this Section would be inadequate and that for any breach of such provisions MLA will, in addition to such other remedies as may be available to it at law or in equity, be entitled to injunctive relief and to enforce its rights by an action for specific performance to the extent permitted by law.

**Attorneys' Fees, Expenses and Right of Setoff.**
The Company shall pay all costs and expenses, including attorneys' fees and expenses, incurred by MLA to enforce this Agreement, including, but not limited to any indemnity provision of this Agreement. This obligation to pay MLA's attorneys' fees and expenses shall apply whether such fees and expenses are incurred during trial or appeal, in arbitration, a bankruptcy case, or otherwise. If so required, MLA shall additionally be entitled to reimbursement of reasonable legal expenses associated with any required court approval of this Agreement or enforcement of provisions of this Agreement, including, but not limited to, fee applications. Company shall reimburse MLA for all such expenses upon presentation of the invoice for the same supported by appropriate documentation. In the event Company fails to reimburse MLA for any such attorneys' fees, expenses, or amounts due pursuant to Company's indemnification obligations, MLA shall be able to use the Retainer to pay such amounts.

**Consent; Entire Agreement.**
In any instance under this Agreement where a party's consent is permitted or required to be given, such consent shall not be withheld unreasonably. This Agreement contains the entire Agreement of the parties with respect to its subject matter, and supersedes all prior agreements and understandings between the Company and MLA with respect to such subject matter. The parties agree that all terms of their agreement and understanding are embodied in this Agreement, and as modified or supplemented from time to time, but only if such modification or supplement is both: (i) in writing, and (ii) signed by all parties.

**Multiple Originals.**
This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile signatures or signatures forwarded via email.

**Notices.**
All notices and other communications must be either delivered in person or sent by mail, postage prepaid, registered or certified, return receipt requested and addressed to the party entitled to receive such notice or communication at the address set forth below or at such other address as such party shall request in a

37024106v2

5

Company's Initials ⟋ℳ

# ⬚ MEADOWLARK ADVISORS

written notice sent to the other party. Except as may be specifically provided herein, such notice shall be deemed effective as of the date of deliver or, if mailed in the manner set forth above, five (5) business days after the date of mailing.

**Force Majeure.**
MLA shall not be liable for any damages for delays or failure in performance under the Agreement caused by acts or conditions beyond its reasonable control, without its fault or negligence, which could not have reasonably foreseen or prevented by reasonable precautions. Such acts or conditions (each a "Force Majeure") shall include, but not be limited to: acts of God or of the public enemy; civil war; insurrections or riots; acts of war; acts of government; acts of terrorism; fires; floods; storms; explosions; earthquakes or accidents; unusually severe weather; epidemics or public health restrictions; strikes or labor troubles causing cessation, slowdown or interruption of work; failures or fluctuations in electrical power, heat, light, air conditioning or telecommunication equipment; and other similar events.

**Interpretation.**
Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any person or entity or under any circumstances, shall be invalid or unenforceable to any extent under applicable law, then such provision shall be deemed severed from this Agreement with respect to such person, entity or circumstance, without invalidating the remainder of this Agreement or the application of such provision to other person, entities or circumstances, and a new provision shall be deemed substituted in lieu of the provision so severed which new provision shall, to the extent possible, accomplish the intent of the parties hereto as evidenced by the provision so severed.

Agreed and accepted:

_____          Date: _____
Meadowlark Advisors, LLC
By: Jonathan Nash

_____          Date: _____6/22/17_____
Franchise Services of North America, Inc.
By: Thomas P. McDonnell, III

Company's Initials ____

37024106v2

## Exhibit B

### *The 20 Largest Unsecured Creditors*

36841671

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Franchise Services of North America Inc.** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF MISSISSIPPI** |
| Case number (if known): | **17-02316-ee** |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Macquarie Capital 125 West 55 Street New York, NY 10019** | **Kevin H. Marino, Esq.** <br><br>**(973) 824-8425 (fax)** | **Professional Services** | **Disputed** | | | **$2,500,000.00** |
| **RJ Young 809 Division Street Nashville, TN 37203** | **(615) 515-7533 (fax)** | **Services** | **Contingent Unliquidated Disputed** | | | **$1,100,000.00** |
| **Macquarie Capital 125 West 55 Street New York, NY 10019** | **Kevin H. Marino, Esq.** <br><br>**(973) 824-8425** | **Professional Services** | **Disputed** | | | **$500,000.00** |
| **David M. Mitchell 100 Forest Avenue Glen Ridge, NJ 07028** | **William F. Ray, Esq.** <br><br>**(601) 965-1901 (fax)** | **Breach of Contract** | **Contingent Unliquidated Disputed** | | | **$450,000.00** |
| **Stikeman Elliott 445 Park Avenue 7th Floor New York, NY 10022** | **(212) 371-7087 (fax)** | **Professional Services** | **Disputed** | | | **$389,963.31** |
| **Osler, Hoskin & Harcourt TransCanada Tower 450 1st St. SW, Ste 2500 Calgary, Alberta T2P 5H1** | **(403) 260-7024 (fax)** | **Professional Services** | | | | **$351,379.58** |
| **Edinger Associates, PLLC 1875 I Street, NW Suite 500 Washington, DC 20006** | **(202) 747-1691 (fax)** | **Professional Services** | **Disputed** | | | **$291,354.95** |

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

| Debtor | **Franchise Services of North America Inc.** | | Case number *(if known)* | **17-02316-ee** |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Daniel Raymond Boland 8 Oakleigh Court Norwalk, CT 06853** | **Kevin H. Marino, Esq.** **(973) 824-8425 (fax)** | **Advancement Demand** | **Contingent Unliquidated Disputed** | | | **$108,706.39** |
| **Michael John Silverton 508 W 24th St 7N New York, NY 10011-1103** | **Kevin H. Marino, Esq.** **(973) 824-8425 (fax)** | **Advancement Demand** | **Contingent Unliquidated Disputed** | | | **$108,706.39** |
| **Horne LLP 1020 Highland Colony Parkw Suite 400 Ridgeland, MS 39157** | **(615) 810-8009 (fax)** | **Professional Services** | | | | **$86,850.00** |
| **J. Michael Linn 1121 N. Halifax Daytona Beach, FL 32118** | **W. Thomas McCraney III** **(601) 510-2939 (fax)** | **Breach of Contract** | **Contingent Unliquidated Disputed** | | | **$50,000.00** |
| **Robert M. Barton 15234 Merlinglen Pl Lithia, FL 35547-3901** | **W. Thomas McCraney III** **(601) 510-2939 (fax)** | **Breach of Contract** | **Contingent Unliquidated Disputed** | | | **$50,000.00** |
| **Young Conaway Stargatt 1000 North King Street Wilmington, DE 19899-0391** | **(302) 571-1253 (fax)** | **Professional Services** | **Disputed** | | | **$37,372.18** |
| **TSD Rental, LLC Attn:  Charles Grieco 1620-1650 Turnpike St. North Andover, MA 01845** | **Charles Grieco** **(978) 794-1455 (fax)** | **Services** | | | | **$25,542.62** |
| **State of Nevada Dept of Taxation 1150 College Pkwy No. 115 Carson City, NV 89706** | **(775) 684-2020 (fax)** | **Taxes** | **Disputed** | | | **$24,917.17** |
| **Canada Revenue Agnecy 875 Heron Road Ottawa, Ontario** | **(613) 952-3845 (fax)** | **Taxes** | **Disputed Subject to Setoff** | | | **$23,362.95** |
| **Horn & Payne, PLLC 1300 Highway 51 Madison, MS 39110** | **(601) 853-2878 (fax)** | **Professional Services** | | | | **$13,051.25** |

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | **Franchise Services of North America Inc.** | | Case number *(if known)* | **17-02316-ee** |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Mississippi Mediation & A P. O. Box 2251 Jackson, MS 39225-2251** | **(601) 969-5582 (fax)** | **Robert Sneed - Arbitrator** | | | | **$12,000.00** |
| **State of Michigan Dept. of Treasury PO Box 77000 Detroit, MI 48277-2000** | **(517) 272-5561 (fax)** | **Taxes** | **Disputed** | | | **$10,838.85** |
| **DE Secretary of State PO Box 5509 Binghamton, NY 13902-5509** | **(302) 739-3812 (fax)** | **Taxes** | | | | **$9,520.00** |

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy