# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2018

Lyle W. Cayce
Clerk

No. 18-60093

In Re: FRANCHISE SERVICES OF NORTH AMERICA, INCORPORATED,

Debtor

FRANCHISE SERVICES OF NORTH AMERICA, INCORPORATED,

Appellant

v.

UNITED STATES TRUSTEE; MACQUARIE CAPITAL (USA), INCORPORATED; MICHAEL JOHN SILVERTON; DANIEL RAYMOND BOLAND; BOKETO, L.L.C.,

Appellees

Appeal from the United States Bankruptcy Court
for the Southern District of Mississippi

Before KING, JONES, and GRAVES, Circuit Judges.

KING, Circuit Judge:

Under longstanding Supreme Court precedent, state law dictates the procedures a corporation must follow to authorize a bankruptcy filing. When those procedures place the decision in the hands of the corporation's creditors, some courts have allowed the bankruptcy to proceed even though the creditors withheld consent. This case presents a related but distinct question: when the certificate of incorporation requires the consent of a majority of the holders of each class of stock, does the sole preferred shareholder lose its right to vote

No. 18-60093

against (and therefore avert) a voluntary bankruptcy petition if it is also a creditor of the corporation?

In this case, the shareholder made a $15 million investment in exchange for 100% of the debtor's preferred stock. At the same time, the debtor reincorporated in Delaware and amended its certificate of incorporation. As a prerequisite to filing a voluntary bankruptcy petition, the amended certificate requires the consent of a majority of each class of the debtor's common and preferred shareholders. Following the ill-fated acquisition of a new subsidiary, the debtor filed for bankruptcy. Fearing that its shareholders might nix the filing, it never put the matter to a vote. The sole preferred shareholder filed a motion to dismiss the bankruptcy petition as unauthorized. But the debtor argued that the shareholder had no right to prevent the filing. The shareholder's parent company, explained the debtor, was an unsecured creditor by virtue of a $3 million bill the debtor refused to pay. The bankruptcy court disagreed and dismissed the petition. On appeal, the debtor asks us to reverse and to allow it to proceed with the bankruptcy.

We decline to do so. Federal law does not prevent a bona fide shareholder from exercising its right to vote against a bankruptcy petition just because it is also an unsecured creditor.[1] Under these circumstances, the issue of corporate authority to file a bankruptcy petition is left to state law. The debtor is a Delaware corporation, governed by that state's General Corporation Law. Finding nothing there that would nullify the shareholder's right to vote against the bankruptcy petition, we AFFIRM.

---

[1] As we note later in this opinion, our holding goes no further. This case involves a bona fide shareholder. The equity investment made by the shareholder at issue here is $15 million and the debt just $3 million. We are not confronted with a case where a creditor has somehow contracted for the right to prevent a bankruptcy or where the equity interest is just a ruse.

2

No. 18-60093

## I.

The debtor in this case is Franchise Services of North America ("FSNA")—once one of the largest car rental companies in North America. Among FSNA's competitors is the Hertz Corporation. In 2012, the Hertz Corporation was trying to consummate a merger with Dollar Thrifty Automotive Group, Inc. Antitrust concerns prompted Hertz to sell one of its subsidiaries, Simply Wheelz, LLC, better known under its trade name, Advantage Rent-A-Car ("Advantage").

FSNA decided to buy Advantage. To do so, it enlisted the help of an investment bank, Macquarie Capital (U.S.A.), Inc. ("Macquarie"). Adreca Holdings Corporation ("Adreca"), one of Macquarie's subsidiaries, would first buy Advantage from Hertz and then merge into FSNA. Adreca bought Advantage in December 2012 and merged into FSNA in May 2013.

Macquarie created another fully-owned subsidiary to help finance the transaction. Boketo, LLC ("Boketo"), was formed in 2012 to make a $15 million investment in FSNA. In exchange for the capital infusion, FSNA gave Boketo 100% of its preferred stock in the form of a convertible preferred equity instrument. Boketo's stake in FSNA would amount to a 49.76% equity interest if converted, making it the single largest investor in FSNA. As a condition of the investment, FSNA in May 2013 reincorporated in Delaware and adopted a new certificate of incorporation. The new certificate provides that FSNA may not "effect any Liquidation Event" unless it has the approval of both "(i) the holders of a majority of the shares of Series A Preferred Stock then outstanding, voting separately as a class . . . , and (ii) the holders of a majority of the shares of Common Stock then outstanding, voting separately as a class." Another section of the certificate clarifies that any "preparatory steps towards or filing a petition for bankruptcy" falls within the ambit of "Liquidation Event."

3

No. 18-60093

FSNA agreed to pay Macquarie a $2.5 million "arrangement fee" and a $500 thousand "financial advisory fee" for its services. Macquarie billed FSNA for the arrangement fee in March 2013, shortly before the merger closed. That fee remains unpaid and is the subject of litigation between the parties in other forums.[2]

Matters quickly took a turn for the worse. It turned out that FSNA had bought a lemon. Advantage went into bankruptcy within a year, and FSNA followed just a few years later. Advantage filed its petition under Chapter 11 of the Bankruptcy Code just six months after the acquisition. A sale of substantially all of Advantage's assets ensued, and the case was dismissed in January 2016. In June 2017, FSNA filed its own voluntary petition under Chapter 11. It did so without requesting or securing the consent of a majority of its preferred and common shareholders.

Therein lies the rub. Macquarie and Boketo filed a motion to dismiss the bankruptcy petition, citing FSNA's failure to seek shareholder authorization. FSNA countered that the shareholder consent provision was an invalid restriction on its right to file a bankruptcy petition. It also asserted that the provision violated Delaware law. The bankruptcy court held an evidentiary hearing on the matter during which it heard live testimony from two witnesses. Because Boketo was an owner, rather than creditor, of FSNA, the bankruptcy court determined that conditioning FSNA's right to file a voluntary petition on Boketo's consent was not contrary to federal bankruptcy policy. The court likewise declined to deem the shareholder consent provision contrary to Delaware law. It instead opted to leave that issue for the Delaware courts to

---

[2] The parties' briefing makes clear that the bankruptcy case is but one front in a larger conflict. In one case in New York state court, Macquarie is suing to collect its fees. FSNA has counterclaimed for its loss of capital value, blaming Macquarie for its tribulations. We need not dwell on the details of the various hostilities. They do not affect our analysis of federal bankruptcy law.

4

No. 18-60093

decide in the first instance. As a result, the court granted Boketo's motion to dismiss.

On FSNA's motion, the bankruptcy court certified a direct appeal of its order to this court pursuant to 28 U.S.C. § 158(d)(2)(A). After finding that FSNA's proposed questions were too narrow to warrant certification of a direct appeal, the bankruptcy court certified the following three questions to this court:

> 1. Is a provision, typically called a blocking provision or a golden share, which gives a party (whether a creditor or an equity holder) the ability to prevent a corporation from filing bankruptcy valid and enforceable or is the provision contrary to federal public policy?

> 2. If a party is both a creditor and an equity holder of the debtor and holds a blocking provision or a golden share, is the blocking provision or golden share valid and enforceable or is the provision contrary to federal public policy?

> 3. Under Delaware law, may a certificate of incorporation contain a blocking provision/golden share? If the answer to that question is yes, does Delaware law impose on the holder of the provision a fiduciary duty to exercise such provision in the best interests of the corporation?

This court authorized the appeal. *See* 28 U.S.C. § 158(d)(2)(A).

## II.

We review a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Ad Hoc Grp. of Timber Noteholders, LLC v. The Pac. Lumber Co. (In re Scotia Pac. Co., LLC)*, 508 F.3d 214, 218 (5th Cir. 2007).

## III.

Before moving to the merits of this case, we must first narrow the questions presented. The bankruptcy court certified three broad questions to this court, each of them involving the enforceability of "a provision, typically called a blocking provision or a golden share." As an initial matter, these terms

are not synonymous, nor have they been precisely defined. Courts appear to use the term "blocking provision" as a catch-all to refer to various contractual provisions through which a creditor reserves a right to prevent a debtor from filing for bankruptcy. *See, e.g.*, *In re Squire Court Partners Ltd. P'ship*, 574 B.R. 701, 706-07 (E.D. Ark. 2017); *cf. In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R. 899, 911 (Bankr. N.D. Ill. 2016) (describing "blocking director" structures whereby secured creditors appoint directors with the ability to veto a voluntary bankruptcy petition).

Generally speaking, a "golden share" is "[a] share that controls more than half of a corporation's voting rights and gives the shareholder veto power over changes to the company's charter." *E.g.*, SHARE, Black's Law Dictionary (10th ed. 2014); *see also* Mariana Pargendler, *State Ownership and Corporate Governance*, 80 Fordham L. Rev. 2917, 2967 (2012) (noting that in the context of formerly stated-owned entities, "[g]olden shares are essentially a special class of stock issued to the privatizing government that grants special voting and veto rights that are disproportionate to, or even independent of, its cash-flow rights in the company"). As used in the bankruptcy context, the term generally refers to the issuance to a creditor of a trivial number of shares that gives the creditor the right to prevent a voluntary bankruptcy petition, potentially among other rights. *See, e.g.*, *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 261-62 (Bankr. D. Del. 2016).

We need not dwell on whether this case involves a "blocking provision" or a "golden share." The facts do not fit neatly into either definition. Boketo made a $15 million equity investment in FSNA. In return, FSNA issued convertible preferred stock to Boketo, amounting to 100% of its preferred stock. The preferred stock carried with it the right, granted in the certificate of incorporation, to vote on certain corporate matters.

No. 18-60093

We must therefore narrow the certified questions. The bankruptcy court requested that we opine generally on the legality of "blocking provisions" and "golden shares." That we cannot do. "[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968). The prohibition of advisory opinions is a constitutional limit on the power of the courts. *Id.*; *see* U.S. Const. art. III, § 2, cl. 1. The bankruptcy court's statutory authority to certify questions to this court does not include the authority to request advisory opinions. True, in amending the law to allow direct appeal to the courts of appeal, Congress anticipated that our review would focus on "unresolved questions of law" rather than "fact-intensive issues." *See* H.R. Rep. 109-31(I), at 148-49 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 206. But this does not license us to answer a question of law divorced from the facts of the case before us and broader than necessary to resolve that case.

We have declined to stray beyond the confines of the certified question in at least one case. *Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 153 (5th Cir. 2018).[3] But there is no prohibition against narrowing the certified question—particularly where doing so would avoid rendering an advisory opinion while still addressing an important question of law. We treat certified questions under 28 U.S.C. § 158(d)(2)(A) "essentially as we treat certified questions from district courts" under 28 U.S.C. § 1292(b). *Crosby v. Orthalliance New Image (In re OCA, Inc.)*, 552 F.3d 413, 418 (5th Cir. 2008). Review under § 1292(b) looks to the entire certified order "and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). This is because § 1292(b) provides

---

[3] In *Ayobami*, "[w]e answer[ed] the certified question only," *declining* to address another question lurking in the background of the case. 879 F.3d at 153-55. We did not opine on our ability to answer that question.

No. 18-60093

for an appeal "*from the order*" and, thus, it is the order that is appealable, not the certified question. *Id.* Just as § 1292(b) provides for an appeal "from the order," § 158(d)(2) provides for an "appeal of the judgment, order, or decree." 28 U.S.C. § 158(d)(2); *see Marshall v. Blake*, 885 F.3d 1065, 1072 n.6 (7th Cir. 2018).

In this case, we decline to answer the bankruptcy court's first certified question regarding the enforceability of "blocking provisions" and "golden shares" generally. "That question is appropriately reserved for a case in which it is not hypothetical." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). Instead we confine our analysis to whether U.S. and Delaware law permit the parties to do what they did here: amend a corporate charter to allow a non-fiduciary shareholder fully controlled by an unsecured creditor to prevent a voluntary bankruptcy petition.

## IV.

A bankruptcy case can be initiated in one of two ways. A qualified "debtor," *see* 11 U.S.C. § 109, can file a voluntary petition, *see* 11 U.S.C. § 301. Or, subject to certain requirements and limitations, creditors can file an involuntary petition against the debtor.[4] *See* 11 U.S.C. § 303(a)-(b). This case concerns a voluntary petition filed under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 1101-74. A corporation like FSNA is a qualified debtor under Chapter 11. *See* 11 U.S.C. § 109(a)-(b), (d). It may therefore file a voluntary petition under that chapter. *See* 11 U.S.C. § 301. But a corporation cannot act on its own; it can act only if authorized by appropriate agents. *See, e.g.*, *W.G. Yates & Sons Const. Co. Inc. v. Occupational Safety & Health Review Comm'n*, 459 F.3d 604, 607 (5th Cir. 2006). The Bankruptcy Code provides that an

---

[4] Though not relevant to this case, the partners of a partnership or "a foreign representative of the estate in a foreign proceeding concerning" the debtor may also file an involuntary petition. *See* 11 U.S.C. § 303(b)(3)-(4).

"entity that may be a debtor" may commence a voluntary case by filing a petition. *See* 11 U.S.C. § 301(a). Still, when the entity is a corporation that can act only through its agents, the Bankruptcy Code does not specify who may file a petition on its behalf.

"In absence of federal incorporation, that authority finds its source in local law." *Price v. Gurney*, 324 U.S. 100, 106 (1945). State law thus determines who has the authority to file a voluntary petition on behalf of the corporation. *See id.* at 106-07; *In re Nica Holdings, Inc.*, 810 F.3d 781, 789 (11th Cir. 2015). If the petitioners lack authorization under state law, the bankruptcy court "has no alternative but to dismiss the petition." *Price*, 324 U.S. at 106. "It is not enough that those who seek to speak for the corporation may have the right to obtain that authority." *Id.* Rather, they must have it at the time of filing. *See id.* at 106-07. Absent a duly authorized petition, the bankruptcy court has no power "to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims." *Id.*

FSNA contends that even assuming Delaware law authorizes the arrangement here, federal law would forbid it. Federal law forbids the arrangement, in FSNA's view, not because it is contrary to any specific statute or binding caselaw, but instead because it violates a federal public policy against waiving the protections of the Bankruptcy Code. Several courts of appeals—though not this one—have opined that a pre-petition waiver of the benefits of bankruptcy is contrary to federal law and therefore void. *See In re Thorpe Insulation Co.*, 671 F.3d 1011, 1026 (9th Cir. 2012) ("This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive." (quoting *Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002))); *Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987) (stating in dictum that "[f]or public policy reasons, a debtor may not contract away the right to a discharge in

No. 18-60093

bankruptcy"); *Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir. 1966) (stating in dictum that "an advance agreement to waive the benefits of the [Bankruptcy] Act would be void"). Boketo agrees that a debtor cannot contract away the protections of bankruptcy. Moreover, this case does not involve a contractual waiver of the right to file for bankruptcy or to a discharge. As this case is framed, we can assume without deciding that such a waiver is invalid. We leave the resolution of that issue for another case, one in which it is squarely presented.

    Instead, this case involves an amendment to a corporate charter, triggered by a substantial equity investment, that effectively grants a preferred shareholder the right to veto the decision to file for bankruptcy. In FSNA's view, this is just a wolf in sheep's clothing—a creditor masquerading as a bona fide equity owner. Boketo is fully controlled by Macquarie, meaning the veto right in fact belongs to Macquarie—an unsecured creditor by virtue of its unpaid fees. In support of its argument, FSNA cites a slew of bankruptcy court cases. These cases all involve arrangements whereby a lender extracts an amendment to the organization's foundational documents granting the lender a veto right in exchange for forbearance. *See In re Lexington Hosp. Grp., LLC*, 577 B.R. 676, 679-81, 684-86, 688 (Bankr. E.D. Ky. 2017) (denying motion to dismiss where lender conditioned financing on grant of equity interest and appointment of non-fiduciary blocking director with right to prevent bankruptcy); *In re Intervention Energy Holdings*, 553 B.R. at 261, 266 (denying motion to dismiss where lender conditioned forbearance on issuance of single common unit in exchange for $1 and amendment of operating agreement to require unanimous consent for bankruptcy); *In re Lake Mich. Beach Pottawattamie Resort*, 547 B.R. at 903-04, 911-15 (denying motion to dismiss where lender conditioned forbearance on appointment of lender as non-fiduciary "special member" with right to prevent bankruptcy but without right

10

to distributions or obligation to make capital contributions); *In re Bay Club Partners-472, LLC*, No. BR 14-30394-RLD11, 2014 WL 1796688, at *3-6 (Bankr. D. Or. May 6, 2014) (denying motion to dismiss where lender requested provision in operating agreement prohibiting filing voluntary petition before all debts were paid in full).

None of these cases concerns the situation here. Even treating Boketo and Macquarie as a single entity,[5] there is no evidence that their arrangement was merely a ruse to ensure that FSNA would pay Macquarie's bill. In 2012, Macquarie, through Boketo, took a substantial equity stake in FSNA, buying convertible preferred stock for $15 million. In 2013, Macquarie issued an invoice for the $2.5 million arrangement fee.[6] FSNA would have us believe the tail wags the dog. It strains credulity to believe that Macquarie made a $15 million equity investment just to hedge against the possibility that FSNA might not pay a $3 million bill. We do not doubt that Macquarie would have preferred to avoid the cost and inconvenience of trying to collect some portion of its $3 million fee as an unsecured creditor in bankruptcy.[7] But if it was anxious about whether FSNA would fail to pay the fee, then it was just throwing good money after bad—$15 million of good money. FSNA points to no

---

[5] The bankruptcy court found that Macquarie fully controlled Boketo and, as we do, assumed for the sake of argument that the companies were one and the same. Although FSNA derides Boketo as a "paper company," there is nothing inherently improper or suspicious about creating a limited liability entity in order to facilitate an investment. At the hearing on this motion, *both* parties' witnesses testified that this practice is "very common" and "typical."

[6] It is not clear from the record when Macquarie billed FSNA for the $500 thousand financial advisory fee.

[7] Boketo's position in bankruptcy is actually worse than Macquarie's. Shareholders are the residual claimants of the estate, *see* 11 U.S.C. § 726(a)(6), entitled only to whatever remains after payment of the various secured and unsecured creditors, *see id.* §§ 507, 726; *cf. Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 385 (5th Cir. 2009) ("When a corporation is insolvent . . . its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." (emphasis removed) (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007))).

No. 18-60093

evidence that would allow us to set aside our incredulity and conclude that Macquarie invested $15 million in FSNA to ensure payment of a $3 million bill.[8]

The Supreme Court held more than seventy years ago that corporate authority to file for bankruptcy "finds its source in local law." *See Price*, 324 U.S. at 106. FSNA has provided us no reason to depart from that general rule in this case. There is no prohibition in federal bankruptcy law against granting a preferred shareholder the right to prevent a voluntary bankruptcy filing just because the shareholder also happens to be an unsecured creditor by virtue of an unpaid consulting bill. "It is one thing to look past corporate governance documents and the structure of a corporation when a creditor has negotiated authority to veto a debtor's decision to file a bankruptcy petition; it is quite another to ignore those documents when the owners retain for themselves the decision whether to file bankruptcy." *In re Squire Court Partners*, 574 B.R. at 708; *see also In re Glob. Ship Sys.*, LLC, 391 B.R. 193, 199, 203 (Bankr. S.D. Ga. 2007) (holding that owner of 20% equity stake and $18 million debt "wears two hats" and may exercise a right to prevent a voluntary bankruptcy petition). In sum, there is no compelling federal law rationale for depriving a bona fide equity holder of its voting rights just because it is also a creditor of the corporation.

FSNA urges that even if a shareholder-creditor could hold a bankruptcy veto right, such a right remains void in the absence of a concomitant fiduciary duty. But FSNA offers no good legal or logical rationale for such a holding. No statute or binding caselaw licenses this court to ignore corporate foundational

---

[8] FSNA repeatedly alleges throughout its brief that Boketo was trying to force it to draw on a $7.5 million Boketo line of credit. FSNA therefore labels Boketo a "potential" creditor. But FSNA admits that it never drew on the line of credit, regardless of the pressure it may have felt to do so. Consequently, the existence of the untapped line of credit is immaterial to the outcome of this case.

documents, deprive a bona fide shareholder of its voting rights, and reallocate corporate authority to file for bankruptcy just because the shareholder also happens to be an unsecured creditor. *Cf. Price*, 324 U.S. at 106 ("[U]nder the Bankruptcy Act the power of the court to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims is strictly limited to those situations where a petition has been approved."). The bankruptcy court opinions FSNA cites are not controlling and not to the contrary. They involve creditors' attempts to appoint non-fiduciary officers and directors with the ability to prevent a bankruptcy filing. *See In re Lexington Hosp. Grp.*, 577 B.R. at 684-86 (holding veto right of creditor-controlled LLC member invalid where the LLC's governing documents directed member to consider only the creditors' interests); *In re Lake Mich. Beach Pottawattamie Resort*, 547 B.R. at 913 ("The essential playbook for a successful blocking *director* structure is this: the *director* must be subject to normal *director* fiduciary duties . . . ." (emphasis added)).[9] As a matter of federal law, fiduciary duties are not required to allow a bona fide shareholder to exercise its right to prevent a voluntary bankruptcy petition.

This is not an advisory opinion, and our holding is limited to the facts actually presented in this case. We hold simply that federal bankruptcy law does not prevent a bona fide equity holder from exercising its voting rights to prevent the corporation from filing a voluntary bankruptcy petition just because it also holds a debt owed by the corporation and owes no fiduciary duty to the corporation or its fellow shareholders. A different result might be warranted if a creditor with no stake in the company held the right. So too might a different result be warranted if there were evidence that a creditor

---

[9] Contrary to the representations in FSNA's brief, the bankruptcy court in *In re Intervention Holdings* expressly declined to consider this issue. *See* 553 B.R. at 262-63.

No. 18-60093

took an equity stake simply as a ruse to guarantee a debt. We leave those questions for another day.

## V.

We turn now to the main event: does Delaware law allow Boketo to exercise the blocking right? Authority to file for bankruptcy is, after all, a matter of state law. *See Price*, 324 U.S. at 106-07. This question has two parts. First, whether Delaware law allows parties to provide in the certificate of incorporation that the consent of both classes of shareholders is required to file a voluntary petition for bankruptcy. Second, whether Delaware law would impose a fiduciary duty on a minority shareholder with the ability to prevent a voluntary bankruptcy petition.

## A.

This is not a diversity case. But because we apply state law to determine whether a corporate bankruptcy petition was properly authorized, the same principles apply. In evaluating issues of state law, we look to the decisions of the state's highest courts. *Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013). In the absence of a controlling decision, we make an "*Erie*[10] guess" as to how the state's highest court would resolve the issue. *Id.* Unless persuaded that the state's highest court would decide the issue differently, we also defer to the decisions of the state's intermediate appellate courts. *Id.*; *see Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). To determine corporate authority to file for bankruptcy, we apply the law of the state of incorporation— here, Delaware. *See Price*, 324 U.S. at 104 & n.1, 106.

## B.

Under the Delaware General Corporation Law, a certificate of incorporation "may" contain:

---

[10] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

No. 18-60093

> Any provision for the management of the business and for the
> conduct of the affairs of the corporation, and any provision
> creating, defining, limiting and regulating the powers of the
> corporation, the directors, and the stockholders, or any class of the
> stockholders, or the governing body, members, or any class or
> group of members of a nonstock corporation; if such provisions are
> not contrary to the laws of this State.

Del. Code tit. 8, § 102(b)(1). As a default rule, "[t]he business and affairs of
every corporation . . . shall be managed by or under the direction of a board of
directors." *Id.* § 141(a). There is, however, an exception to the default rule: the
management prerogative rests with the board, "except as may be otherwise
provided in this chapter or in its certificate of incorporation." *Id.* If the
certificate departs from the default rule, then "the powers and duties conferred
or imposed upon the board of directors by this chapter shall be exercised or
performed to such extent and by such person or persons as shall be provided
in the certificate of incorporation." *Id.*

"Delaware's corporate statute is widely regarded as the most flexible in
the nation." *Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 845
(Del. Ch. 2004). Instead of dictating a rigid structure, "it leaves the parties to
the corporate contract (managers and stockholders) with great leeway to
structure their relations, subject to relatively loose statutory constraints." *Id.*
"Sections 102(b)(1) and 141(a) . . . embody Delaware's commitment to private
ordering in the charter." *Id.* In light of that commitment and the "broad effect"
of these statutes, Delaware courts do "not lightly find that certificate
provisions are unlawful." *Id.* at 845-46. A provision is not contrary to Delaware
law just because it withdraws traditional power from the board. The "obvious
purpose" of § 141(a) "is to permit (absent some conflict with Delaware public
policy) certificate provisions to withdraw authority from the board." *Id.* at 852.

We nonetheless decline to resolve whether the shareholder consent
provision violates Delaware law. In the bankruptcy court, FSNA argued that

15

the shareholder consent provision is invalid under Delaware law. On appeal, however, FSNA has expressly waived any such argument, stating that the "abstract question as to whether Delaware would ever allow a blocking provision need not be debated." When a party expressly waives an issue or argument, we lack the benefit of adversarial briefing and generally decline to consider the issue. *See Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004). We have all the more reason to do so here. The parties have not identified, and we have not discovered, any on-point Delaware cases. We decline to decide in the first instance whether the Delaware General Corporation Law would tolerate a provision in the certificate of incorporation conditioning the corporation's right to file a bankruptcy petition on shareholder consent.[11] For the purposes of this case, we assume it would.

## C.

FSNA contends that Delaware law would classify Boketo as a controlling minority shareholder because of its ability to block a bankruptcy filing. As a result, fiduciary obligations would arise, invalidating any attempt to exercise the bankruptcy veto right. FSNA is wrong on both fronts.

### 1.

Under Delaware law, a shareholder is generally free to act in its self-interest, unencumbered by any fiduciary obligation. *See Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987). But there are two exceptions. "[A] shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Id.* Delaware law thus imposes fiduciary duties on two kinds of shareholders: majority shareholders and minority controlling shareholders. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994); *Ivanhoe*

---

[11] The bankruptcy court declined to decide this issue for the same reason.

*Partners*, 535 A.2d at 1344; *see also Lewis v. Knutson*, 699 F.2d 230, 235 (5th Cir. 1983) (applying Delaware law). Boketo owns convertible preferred shares that would amount to a 49.76% equity stake in FSNA if converted. That interest, though formidable, is just shy of majority control. Boketo could therefore only owe a fiduciary duty if it qualifies as a controlling minority shareholder. *See Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507-08 (Del. 2005); *Kahn*, 638 A.2d at 1113-14.

The standard for minority control is a steep one. Potential control is not enough. *See In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006). Instead, the shareholder must "dominat[e]" the corporation "through *actual control* of corporation conduct." *Kahn*, 638 A.2d at 1114 (emphasis added) (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)); *see Lewis*, 699 F.2d at 235; *cf. Solomon v. Armstrong*, 747 A.2d 1098, 1117 n.61 (Del. Ch. 1999) ("[A] plaintiff must allege *literal control* of corporate conduct." (emphasis added)), *aff'd*, 746 A.2d 277 (Del. 2000) (unpublished table disposition). The "actual control test" is not easily satisfied. *See In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 992 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015). A minority shareholder exercises "actual control" only when it has "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." *Id.* (quoting *In re PNB Holding Co. S'holders Litig.*, No. CIV.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

In making that determination, Delaware courts focus on control of the board. *See id.* at 992-93 (first citing *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. CIV.A. 1668-N, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006); then citing *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013)). The shareholder's command over the board must be "so

potent that independent directors . . . cannot freely exercise their judgment, fearing retribution." *In re Morton's Rest. Grp.*, 74 A.3d at 665 (alteration in original) (quoting *In re PNB Holding Co.*, 2006 WL 2403999, at *9). In short, a minority controlling shareholder must have "a combination of potent voting power and management control such that the s[hare]holder could be deemed to have effective control of the board without actually owning a majority of stock." *Corwin*, 125 A.3d at 307 (footnote omitted).

"A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it." *Kaplan v. Centex Corp.*, 284 A.2d 119, 122 (Del. Ch. 1971); *see* 12B William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 5811.50 (perm. ed., rev. vol. 2017) ("There must be some evidence demonstrating control, however, since the presumption is against it."). FSNA's argument for a finding of control boils down to this: Boketo owned preferred stock convertible to a 49.76% equity stake; it appoints two of the five directors (that is, a minority); and it is seeking to exercise its veto right (allegedly to squelch a lawsuit against its parent company). Although the size of the shareholder's equity stake is a factor in the analysis, it is not dispositive. *See In re PNB Holding Co.*, 2006 WL 2403999, at *9. "[T]he cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder." *In re Crimson Expl. Inc. Stockholder Litig.*, No. CIV.A. 8541-VCP, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014); *see also id.* at *10 n.50 (collecting cases); *compare, e.g.*, *In re W. Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at *1, *29-30 (Del. Ch. May 22, 2000) (granting summary judgment based on finding that 46% shareholder did not exercise actual control), *with Kahn*, 638 A.2d at 1115 ("[N]otwithstanding its 43.3 percent minority shareholder interest, Alcatel did exercise actual control over Lynch by dominating its corporate affairs.").

No. 18-60093

In other words, the size of Boketo's stake is not enough. Instead, to demonstrate that Boketo is a controlling shareholder, FSNA must prove that Boketo *actually* dominated FSNA's corporate conduct. *See Kahn*, 638 A.2d at 1114; *Kaplan*, 284 A.2d at 122-23.

In *Kahn*—the "seminal" controlling shareholder case, *In re KKR Fin. Holdings*, 101 A.3d at 991—the Delaware Supreme Court found that a shareholder exercised actual control "*notwithstanding* its 43.3 percent minority shareholder interest." 638 A.2d at 1115 (emphasis added). The board in that case was considering both the renewal of management contracts and a proposed merger. *See id.* at 1114-15. In each case, the minority shareholder prevailed—"not because the [independent directors] decided in the exercise of their own business judgment that [its] position was correct," but because they felt powerless in the face of its opposition. *See id.* Indeed, one of the shareholder's appointed directors told the other board members, "You must listen to us. We are 43 [sic] percent owner. You have to do what we tell you." *Id.* at 1114. One of the independent directors testified that that statement "scared [the independent directors] to death." *Id.* Based on that evidence, the Delaware Supreme Court affirmed the Chancery Court's finding of actual control. *Id.* at 1115.

Likewise, the Chancery Court found that a 40% shareholder was a controlling shareholder in *In re Cysive, Inc. Shareholders Litigation*, 836 A.2d 531, 535, 552-53 (Del. Ch. 2003)—a case characterized by the Chancery Court as "its most aggressive finding that a minority blockholder was a controlling stockholder," *In re Morton's Rest. Grp.*, 74 A.3d at 665. In addition to his sizeable minority stake, the shareholder there was the company's founder, chief executive officer, and chairman. *In re Cysive, Inc.*, 836 A.2d at 552. "He [was], by admission, involved in all aspects of the company's business . . . ." *Id.* Moreover, several of his family members occupied high-level positions within

the company. *Id.* The shareholder's "day-to-day managerial supremacy" distinguished the case from cases in which the Chancery Court had found that holders of even larger blocks of shares were not controlling shareholders. *Id.* (citing *In re W. Nat'l Corp.*, 2000 WL 710192, at *6).

Despite Boketo's sizeable stake in FSNA, FSNA has pointed to no evidence that Boketo exercises *actual* control. FSNA cites Boketo's appointment of two of its five directors as evidence of control. But the appointment of a minority of directors—without more—is insufficient to demonstrate actual control. *Cf. In re Morton's Rest. Grp.*, 74 A.3d at 665 (finding that shareholder's 27.7% stake and control of two of ten board members, "without more, does not establish actual domination of the board"). FSNA has offered no evidence that, despite its minority board representation, Boketo's influence was so pervasive that it would qualify as a controlling shareholder under Delaware law. *See Corwin*, 125 A.3d at 307; *Kahn*, 638 A.2d at 1114-15; *In re KKR Fin. Holdings*, 101 A.3d at 992-93; *In re Morton's Rest. Grp.*, 74 A.3d at 665.

FSNA also claims that Boketo exercises actual control by virtue of its ability to prevent a voluntary bankruptcy filing by exercising its voting rights as a 100% preferred shareholder. But what matters is the dominating shareholder's *actual* exercise of control, not just the theoretical possibility that it *might* do so. *See Kahn*, 638 A.2d at 1114; *In re Primedia Inc.*, 910 A.2d at 257; *Solomon*, 747 A.2d at 1117 n.61. FSNA has not alleged domination of its day-to-day management. Instead, it claims only that Boketo *seeks* to exercise its veto right, which is enough to show control in FSNA's view. But the assertion is self-refuting. Boketo never did manage to exercise its right to vote one way or the other. FSNA's board never put the matter to a vote; instead, it simply adopted a resolution to file for bankruptcy without the shareholders' consent. A controlling shareholder's command of the board must be "so potent

that independent directors . . . cannot freely exercise their judgment, fearing retribution." *In re Morton's Rest. Grp.*, 74 A.3d at 665 (alteration in original) (quoting *In re PNB Holding Co.*, 2006 WL 2403999, at *9).

Such was not the case here. The FSNA board's apparent ability and willingness to act without Boketo's consent undercuts the case for control. Boketo's inability to prevent the board from authorizing the filing—despite its right to do so—disproves the existence of the type of "potent voting power and management control" necessary to impose fiduciary obligations on a minority shareholder. The mere existence of the right to control is not enough; Boketo must have actually exercised it. *See Kahn*, 638 A.2d at 1114; *In re Primedia Inc.*, 910 A.2d at 257; *Solomon*, 747 A.2d at 1117 n.61. Nor does Boketo's intervention in the bankruptcy proceedings bolster the case for control. Indeed, the very fact that Boketo had to resort to filing a motion to dismiss the bankruptcy petition—an action hotly contested by FSNA in the bankruptcy proceedings and on appeal—only emphasizes its inability to control FSNA. To reuse a phrase: if Boketo is a controlling shareholder of FSNA, then the tail is wagging the dog.

### 2.

Even assuming Boketo were a controlling shareholder, there is a more fundamental defect in FSNA's argument. The proper remedy for a breach of fiduciary duty claim is not to allow a corporation to disregard its charter and declare bankruptcy without shareholder consent. Absent a properly authorized petition, the bankruptcy court has no "power . . . to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims." *Price*, 324 U.S. at 106.

In *Price*, the debtor defaulted on its bonds and then struck a deal with its bondholders. *Id.* at 101. To placate them, it placed over 50% of its stock in a voting trust controlled by the bondholders. *Id.* The bondholders then

controlled the company and elected its directors. *Id.* A majority of the shareholders tried to file a voluntary petition on the debtor's behalf. *Id.* at 102. The shareholders claimed that the voting trust was illegal and had expired by its own terms anyway. *Id.* They also claimed that the directors were unlawfully elected and had violated their fiduciary duties, thereby transferring to the shareholders the right to control the company. *Id.* at 104. The court acknowledged that the shareholders "may have [had] a meritorious case for relief." *Id.* at 107. But bankruptcy proceedings were not the appropriate venue to seek a remedy for their grievances. *See id.* at 106-07. Their remedy, if any, was under state law. *See id.* at 107.

Because we have already concluded that Boketo would not qualify as a controlling shareholder under Delaware law, we need not (and do not) decide whether it breached a fiduciary duty. Even if it had, the proper remedy is not to deny an otherwise meritorious motion to dismiss the bankruptcy petition. Instead, to the extent that Boketo breached any fiduciary duty owed as a controlling shareholder, FSNA must seek its remedy under state law.

## VI.

For the foregoing reasons, we AFFIRM.